**Michael PARD and Kerry Pard,
Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. No. 83–186–SO.**

United States District Court,
D. Oregon.

June 20, 1984.

Hugh G. Grady, Portland, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Jack C. Wong, First Asst. U.S. Atty., Portland, Or., for defendant.

## OPINION

SOLOMON, Judge.

Plaintiffs, Michael Pard, a Vietnam veteran, and Kerry Pard, his present wife, filed this action for damages against the United States. They allege that the Veterans Administration (VA) failed to diagnose and treat Michael for post traumatic stress disorder (PTSD), a mental illness which resulted from his combat experience in Vietnam, and for acute agitated depression. The Pards assert that because of the VA's negligent failure to diagnose his condition and treat it properly, Michael's mental state deteriorated steadily and resulted in his attempt to kill his ex-wife. In that attempt, Michael was injured in a police shootout, tried for the attempted murders of his ex-wife, her husband, and a police officer, and committed to Oregon State Hospital.

The government disputes the diagnosis of PTSD and contends that, even if the VA did misdiagnose Michael's illness, there was no causal relationship between the misdiagnosis and the shootout. The government also contends that there was no patient-therapist relationship between the VA and Michael, and that the VA's treatment of Michael was reasonable.

### Facts

Michael Pard was drafted into the United States Army in April, 1967. In November, he was sent to Vietnam with the First Air Cavalry where he served as crew chief on a helicopter gunship. After four and one half months in Vietnam, he was injured when his machine gun exploded. He was sent back to the United States where he completed his military service. On his discharge from the Army, Michael attended a community college and worked as a welder.

In October, 1967, before he left for Vietnam, Michael had married Shirley Towne. In March, 1968, Shirley gave birth to a daughter, Karen, whom Michael regarded as his own child even though he was not her natural father.

After a few years, the marriage encountered difficulties, with Shirley and Michael each accusing the other of infidelity. In October, 1977, Shirley and Michael separated. Shirley filed a suit for divorce. In November, Michael took Karen to LaPine, Oregon while Shirley remained in Long Beach, California to sell their house.

Michael was with Karen in LaPine from November until February, 1978. During that time, Michael became very attached to Karen. In February, Shirley came to LaPine and took custody of Karen. Michael moved to Bend. Although Michael was dating Kerry Kirk, whom he later married, he and Shirley were reconciled with each other intermittently.

Michael and Shirley were divorced in July, 1978. Before and after the divorce, they had quarrelled over the division of their property and Michael's visits with Karen. Michael's hostility toward Shirley was expressed in a series of escalating incidents. He broke into Shirley's trailer several times, and on each occasion took away or damaged property.

Michael married Kerry in August, 1978. In September, Shirley refused Michael permission to see Karen. Later that month during a quarrel over the proceeds of the house sale, Michael beat Shirley with his fists. Michael's last visit with Karen was in October. Michael became extremely bitter over the loss of Karen, for which he blamed Shirley.

In 1974, the VA had established a "satellite" mental health clinic in Bend, Oregon to provide psychiatric services to veterans living in central Oregon. These services consisted of medication maintenance, crisis intervention counseling, and patient referral. The clinic was operated two days a month and was staffed by a psychiatrist, Dr. Roger Smith, and a psychiatric social worker, Robert Stevens, both of whom traveled from Portland to Bend. The clinic's offices were located in the courthouse annex.

Michael and Kerry Pard requested counseling from the VA clinic for Michael's violent anger toward Shirley. Smith and Stevens did an intake interview with Michael on December 14, 1978. They observed that his problem was "explosive rage directed at ex-wife" and noted that Michael told them that he intended to kill her if she did not give him his share of the house proceeds. Although Smith took a basic medical history, neither he nor Stevens did a mental status examination, a psychosocial history, or a family history of Michael. Stevens told the Pards that the VA clinic lacked the facilities to treat him and referred them to the Deschutes Family Counseling Clinic. Dr. Smith prescribed a one-month supply of Valium for Michael to control his agitation.

Michael received counseling at the Deschutes Family Counseling Clinic from December 18, 1978 to January 29, 1979. He refused to continue treatment after the staff told him he must either make a commitment to regular therapy or the clinic would notify the police that he had threatened to kill Shirley.

The Pards returned to the VA clinic on February 15 and again on March 8. During this time, Stevens tried to arrange a meeting with Shirley and Karen to resolve the problem of Michael's visits with Karen. The meeting was arranged for April 12.

On April 12, Michael accosted Shirley and Karen in the courthouse parking lot. He pointed a gun at Shirley and demanded that she give him $6,000 or he would take Karen to California. When Michael realized that Karen had slipped away into the courthouse, he drove away. Michael was later arrested for menacing and lodged in jail overnight.

The Pards saw Stevens in Portland for several sessions during one week in April. Kerry and Stevens discussed the possibility of hospitalizing Michael. Both doubted that Michael would agree to voluntary hospitalization, and Stevens believed it would be impossible to have Michael hospitalized involuntarily.

The Pards failed to appear at the VA clinic between May and October, 1979. In June, Michael was convicted of the menacing charge for the April 12 incident. The court imposed a suspended sentence on condition that Michael obtain regular counseling. After Michael had failed to appear at the office for four months, the VA clinic closed his file for lack of contact. On September 10, Michael was found in contempt of court for violating the restraining order obtained by Shirley. The court imposed a ninety-day sentence but suspended it on condition that Michael receive counseling.

About two weeks later, Kerry saw a letter from Shirley's attorney in which he told Michael's attorney that if Michael did not receive counseling immediately Shirley would move to have the court impose the jail sentence which had been suspended. The Pards made an appointment to see Stevens on October 18.

At this meeting, Stevens became aware for the first time that the court had ordered Michael to obtain counseling. Michael also told Stevens that he had a gun and that he intended to kill Shirley.

Stevens told the Pards that Michael needed more intensive counseling than the VA clinic could provide. Stevens referred the Pards to several local practitioners. Michael agreed to consult one of them.

On October 22, a bench warrant was issued for Michael's arrest. Two days later, Michael received a copy of the warrant in the mail. Michael armed himself with a rifle and handgun and drove off looking for Shirley. Kerry called Shirley's husband to warn him. Michael intercepted Shirley and her husband and chased them through Bend firing from his car until they drove into police headquarters. Michael was pursued by a state trooper. During the ensuing shootout, Michael was wounded in the head, leg and hand. He was arrested and charged with three counts of attempted murder.

Michael's lawyer decided to assert for Michael the defense of diminished capacity and mental disease. He hired several experts, including Dr. Kevin McGovern, a psychologist. On December 1, 1979, McGovern interviewed Michael, reviewed his history, and administered psychological tests. Dr. McGovern interviewed Michael a second time on February 15, 1980 and made a videotape of that interview. During that second interview, Dr. McGovern asked a number of leading and suggestive questions designed to show that Michael was suffering from combat stress and that he had the symptoms of post traumatic stress disorder. It was during this videotaped session that Michael, crying, first told McGovern or any other doctor or therapist that he had killed three children in Vietnam, that he saw Karen's face superimposed on theirs during nightmares, and that he experienced flashbacks to Vietnam when he was welding.

Until this interview, which was videotaped and played to the jury as an important part of Michael's criminal defense, Michael had never indicated that Vietnam had been a traumatic experience for him. In fact, Michael had wanted to re-enlist in the Army and return to Vietnam in 1969. He did not do it because his mother became upset, and his wife threatened to leave him. Michael had never before complained of recurring nightmares about Vietnam or about intrusive daytime reveries.

This interview was also the first time Michael had alleged that he had only a vague memory of the October 24 shootout. Immediately after the shootout, Michael had spoken to a Bend policeman in the ambulance and had asked if he had killed Shirley. The day after the shootout, Michael was interviewed in the hospital by a psychiatrist, Dr. Hale Henson. Michael showed complete recall of the shootout and all the events leading to it. He was coherent and logical, with no sign of disordered thought process.

Michael was tried on February 20, 1980. McGovern testified at the trial that he believed Michael was suffering from war-related post traumatic stress disorder and associated agitated depression. The American Psychiatric Association has defined post traumatic stress disorder as the development of symptoms after a psychologically traumatic event not generally encountered in human experience, such as war, torture, or confinement in a concentration camp. The traumatic event is called a stressor. The symptoms include re-experiencing of the event through nightmares or intrusive daytime reveries, reduced responsiveness to the outside world ("psychic numbing"), and physical or mental symptoms such as sleep disturbance, startle reactions, heightened alertness, impaired memory, and diminished ability to concentrate.[1]

Dr. McGovern testified that Michael was in a dissociative state—that is, out of touch with reality—during the shooting incident. He also testified that he believed Michael re-experienced combat during the shootout, and that Michael was therefore not responsible for his acts. The videotape of McGo-

---

1. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disor- ders § 309.81 (3d ed.1980).

vern's interview with Michael was shown to the jury.

Michael was found not guilty by reason of mental disease. On March 15, he was placed in the custody of the Psychiatric Security Review Board for a period of thirty years and was committed to Oregon State Hospital. However, Michael received no treatment at the hospital because, in the staff's view, he was not suffering from post traumatic stress disorder but rather from a personality disorder.

In August, 1980, at a hearing before the Psychiatric Security Board, Dr. Wesley Weissert, one of Michael's psychiatrists at Oregon State Hospital, testified that Michael did not need to remain at the hospital. Michael testified that his nightmares about the war stopped after his trial. About three months later, after eight months at Oregon State Hospital, Michael was released with the understanding that he would seek outpatient therapy with McGovern.

In one of his sessions with the Pards, McGovern told them that he believed the VA had been negligent in its diagnosis and treatment of Michael's illness. He said he thought the failure of Stevens and Smith to obtain Michael's history—especially his military history—prevented them from making a correct diagnosis of Michael's condition. He also believed that Stevens should have recognized Michael's imminent dangerousness and taken decisive steps, such as hospitalization, to protect Michael and Shirley. Dr. McGovern recommended that the Pards see an attorney and suggested the names of several, one of whom the Pards retained.

They made two claims against the United States which totaled $9.5 million. The claims sought compensation for Michael's injuries and for loss of consortium to Kerry.

Michael applied for VA disability benefits. In 1981, he was examined by two VA psychiatrists, Dr. Roland Atkinson and Dr. Neal Ely. On the basis of the statements made to them by Michael concerning his traumatic war experiences, and on the basis of the symptoms he described, they diagnosed post traumatic stress disorder. The VA awarded Michael a temporary 100% disability rating, later reduced to a permanent 30% rating. Michael began to receive benefits as of October 1, 1980.

After the United States denied the Pards' damage claims, the Pards filed this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. (1976 & Supp.V.1981).

The government denies that Michael has ever suffered from PTSD and alleges that his statements about his experiences in Vietnam were deliberate lies.

Michael testified that during the four and one half months he was in Vietnam, he and the other crew chiefs flew sixteen hours a day during which time they averaged five combat missions. He also testified that he personally killed at least thirty people, and that he and his helicopter crew killed four hundred persons. Michael also described how he had killed three Vietnamese children after one of them shot an American soldier, and how he and members of his crew rescued a general. Michael testified that he received the Distinguished Flying Cross for his part in the rescue of the general, and that he had also received a Bronze Star for valor.

Dr. McGovern testified and showed the videotape at this trial. He testified that he believed Michael's story of his Vietnam experience and thought Michael suffered from PTSD so that he was not responsible for his actions at the time of the shootout. Dr. McGovern said he had made the videotape as a diagnostic tool. Dr. McGovern concluded that the VA, particularly Mr. Stevens, had been negligent when they failed to obtain a military history from Michael.

Dr. John Yost and Dr. Atkinson, both called by the Pards, testified that although they had seen the videotaped interview between Michael and Dr. McGovern, they did not regard it as a valid indicator of Michael's condition. They found it unacceptable as a diagnostic tool because the ques-

tions asked by Dr. McGovern were leading and suggestive. Nevertheless, they said that if Michael's statements were true, and if Michael had had the experiences in Vietnam that he described in the interview, then he was suffering from post traumatic stress disorder. But all the psychiatric experts agreed that PTSD requires a stressor, and if Michael did not experience the traumatic events in Vietnam that he described, there would be no basis for a PTSD diagnosis.

The government introduced evidence showing that Michael's stories about his combat experience in Vietnam were false. Michael's commanding officer, a pilot, and a fellow crew chief, all of whom served with Michael in Vietnam, testified that Michael's unit was primarily administrative and that members of the unit saw little, if any, combat. None of them had ever heard of the incident in which Michael claims he shot three children or in which he or his unit saved a general. Michael's commanding officer said that he had never recommended Michael for either the Bronze Star or the Distinguished Flying Cross, and that Michael would have been ineligible to receive them. Michael's military file contains no indication that Michael ever received either decoration.

Shirley testified that although Michael often bragged about events in Vietnam, he had never mentioned an incident in which he killed three Vietnamese children.

Dr. Atkinson, one of Pards' witnesses, is the VA psychiatrist who had approved Michael for VA benefits. He testified that his diagnosis was dependent on the truth of Michael's statements about his experiences in Vietnam. Dr. Atkinson was not convinced that Michael had suffered from PTSD in 1978 and 1979 because he did not regard Michael's violent activity on October 24 consistent with PTSD. When violent behavior accompanies PTSD, it is associated with a re-experiencing of the stressor, and almost always is unmotivated and unexpected. The victim of the violence is usually randomly encountered. Michael's aggression on October 24 was directional, a response to what Michael regarded as provocation. It was logically connected to past events, and the target of his violence was his ex-wife, a specific person against whom Michael felt a powerful grievance.

Dr. Edward Colbach, one of Portland's leading psychiatrists who is president of the Oregon Psychiatric Association, testified for the government. He agreed with Dr. Atkinson that Michael's behavior was not consistent with a diagnosis of PTSD. Rather, Dr. Colbach believed that during the time just before and during the shooting, Michael was showing a maladaptive reaction to the problems he was having with Shirley and Karen. The reaction was superimposed on Michael's underlying personality disorder. He acted out his anger and humiliation in aggressive and violent conduct.

Dr. Colbach testified that he believes Michael also has a seriously anti-social personality, a condition from which he has suffered since he was a child, which manifests itself in his current behavior. Dr. Colbach stated that Michael's history shows that he attributes his own problems and shortcomings to the actions of others and refuses to take responsibility for his own actions. Dr. Colbach believed that this was what motivated Michael to blame his behavior in 1978 and 1979 on a fabricated story about Vietnam, first because it enabled him to avoid the consequences of his criminal activity, and later because it offered him an opportunity to enrich himself. Dr. Colbach testified that, in his opinion, Michael's actions after his meeting with McGovern have constituted a "con of such brazenness and magnitude, to end up in federal court like this, that it can only be pulled off by an anti-social personality."

Dr. Norman Q. Brill is the Acting Associate Chief of Staff/Education, Brentwood V.A. Medical Center, Los Angeles, California, with the Veterans Administration. He was in the Army as Chief of Neuropsychiatry Section, Station Hospital, Fort Bragg, North Carolina. At various times, he was Chief of the Psychiatry Branch of the Office of the Surgeon General in Washington,

D.C. He has seen hundreds of patients suffering from stress disorders relating to war activities. As a consultant to the Surgeon General of the Air Force and Army, he visited Vietnam where he inspected numerous medical facilities. His testimony on the videotape and the diagnosis that Michael Pard was suffering from post traumatic stress disorder is both interesting and instructive. He testified:

Kevin McGovern was the first one who diagnosed PTSD. This occurred after interviews in which Pard was pressed to mention details of his military experience and seeking to document a pre-conceived conclusion if one is to judge from a review of the taped interview. It is quite clear that when he asked Pard about nightmares, Pard did not talk about nightmares, but of an incident of shooting in self defense. Dr. McGovern tried again by saying 'you killed all three little kids,' hoping to evoke some mention of nightmares, but again Pard said nothing about nightmares. When Pard insisted he had shot in self defense, McGovern, out of a clear blue sky, insisted 'I want you to keep thinking about the dream.' There had been no mention by Pard of a dream. When McGovern pressed him further by asking 'is this a real dream or did it happen' Pard said 'it happened.' McGovern then again says 'and this is a recurring nightmare you have?' Again Pard does not say that it was a nightmare, but 'it was something he had to do over there.' Now, without going into further detail, this exemplifies the nature of Dr. McGovern's questioning, which is so faulty and leading in character as to cast grave questions about his conclusions. I mention this not to criticize Dr. McGovern, but to try to explain the difference in opinions about the diagnosis. It would seem that others, including the VA Board, appeared to have been influenced by Dr. McGovern's report and presumed findings.

In my experience over many years, I have not seen a PTSD that was delayed ten (10) years in making its appearance, nor one that was touched off by an incident of stress that bore no seeming relationship to the original stress (military) that may have provoked it. PTSD disorders invariably manifest themselves soon after return to civilian life, but in rare instances may be delayed two (2) or three (3) years until re-exposure to a stimulus bearing some resemblance to the original stress. I believe Mr. Pard's emotional problems that led up to his attempting to shoot his ex-wife was rooted in his problems with his first wife. While I am reluctant to give any diagnosis without examining a person, I am mindful of the fact that Pard was not exactly a well adjusted individual prior to service. He has a history of having been truant from school, of having problems with authority (possibly relating to his relationship with his father whom he characterizes as a strict disciplinarian), of having been arrested and spending three (3) days in jail for having stabbed someone with a knife in a fight, of smoking, growing and selling marijuana, of having run away from home at 15, of being rebellious, of quitting jobs because he couldn't get along with the boss, of lying under oath to a judge about having a gun and threatening his ex-wife because he didn't want to give her any satisfaction, of having killed the family cat, of smoking in school, etc. This all suggests some pre-existing problem with impulse control and difficulty in handling aggressive feelings.

It further suggests that it would be stretching the point to assume there was any significant relationship between Pard's military experience and his attempt to kill his ex-wife. I know of no statistical association between war experience and reports of men who have attempted or succeeded in killing their wives. There crimes certainly occur without the benefit of a Post-traumatic Stress Disorder.

■ On the basis of all the evidence, I conclude that Michael Pard's allegations about his combat experiences are not true. He did not have those experiences, there

were no stressors, and Michael Pard has never suffered from post traumatic stress disorder.

The Pards brought this action for damages resulting from a war-related post traumatic stress disorder and from the government's failure to diagnose and treat that condition. During the trial, for the first time, counsel for the Pards advanced an alternative theory of recovery. He asserted that even if Michael Pard did not engage in combat in Vietnam, and even if his mental condition was not a war-related post traumatic stress disorder, the government is still liable for the VA's negligent treatment of Michael's illness.

The plaintiffs must set out with specificity the basis upon which they seek to recover. Throughout this action, the Pards have contended that the VA was negligent because of its failure to diagnose and properly treat the mental illness which Michael Pard suffered as a result of his experiences in Vietnam. In their administrative claim, the Pards sought damages for:

> the negligent failure of the personnel of the Veterans Administration to adequately diagnose, treat and care for the severe emotional condition from which Mr. Pard was suffering—specifically, the fact that he was suffering from "delayed stress syndrome" an acute agitated depression, and other severe emotional difficulties *as a result of his service during the Vietnam War.*

The Pards' complaint, paragraph 4, states:

> That the defendant's agency, the Veterans Administration, was careless and negligent in their treatment of plaintiff Michael Pard in that during the period from December, 1978 through October, 1979, they failed to diagnose, treat and care for the severe emotional condition from which plaintiff Michael Pard was suffering, specifically: post traumatic stress syndrome, acute agitated depression, and other severe emotional difficulties *as a result of plaintiff's military service during the Vietnam War.* (emphasis added).

The pretrial order framed the negligence issue in the same way. The Pards asked that the court take judicial notice of the VA's finding that Michael "was and is suffering from post traumatic stress disorder." The government contended that the VA's disability determination did not "estop the government from offering evidence which establishes that the plaintiff did not have post traumatic stress disorder during the relevant times in this case."

■ At the trial, the Pards called two experts who testified that Michael was suffering from PTSD. They submitted exhibits, such as Michael's VA file, his Army records, and the transcript of his criminal trial, to support their allegation that Michael was suffering from PTSD. The Pards also attempted to keep out evidence introduced by the government that Michael was suffering from a personality disorder unrelated to his war experience and that he had been maladjusted as a child.

In my view, it is too late for the Pards to contend that they are entitled to damages because the VA failed to treat a condition which is unrelated to his war experiences and which dated back to his youth.

But even if the Pards could raise this new basis for recovery, I find no merit to the contention that Michael's injuries were caused by negligent treatment on the part of the VA, specifically by Stevens' failure to take a full history and by his failure to have Michael involuntarily committed to a mental hospital.

To determine whether the VA was negligent, we must look to Oregon law. 28 U.S.C. § 1346(b). The Pards to prevail must show that the VA owed Michael Pard a duty, that the VA breached that duty, and that the breach resulted in damage to the Pards. *Brennen v. City of Eugene,* 285 Or. 401, 405, 591 P.2d 719 (1979).

■ There is no duty to control the conduct of another to prevent him from harming a third person absent a special relationship giving rise to such a duty. *See Restatement of Torts* 2d § 315. The Pards contend that the patient-therapist relation-

ship between Michael and Stevens gave rise to such a duty.

■ The government asserts that there was no patient-therapist relationship between Michael Pard and Stevens. The government points out that the clinic was merely a satellite unit which operated in temporary office space for only two days a month and was not equipped to provide regular ongoing psychiatric treatment.

The evidence shows that Smith and Stevens both realized during the first session with the Pards that Michael's problems were affected by his relationship with Shirley, and that these problems were so severe that they required intensive therapy. They informed Michael that the VA was not equipped to treat him, and they referred him to the Deschutes County Family Counseling Clinic where he could receive such treatment on a weekly basis. Michael accepted the referral and received counseling from the Family Counseling Clinic until the clinic told him that unless he agreed to regular counseling sessions they could not treat him and they would have to notify the police of his threats against Shirley. As a result of these conversations, Michael refused further treatment from the Family Counseling Clinic.

Stevens saw the Pards during the months of March and April. He continued his efforts to refer Michael to other practitioners but was hindered by Michael's insistence that therapy must be scheduled outside work hours and be provided free or at minimal cost.

The Pards assert that because Stevens continued to see Michael after Michael refused to return to the Family Counseling Clinic, a patient-therapist relationship was created regardless of whether Stevens wanted or considered such a relationship to exist.

Even if a patient-therapist relationship did exist through April, 1979, the Pards terminated that when they allowed five and one half months to elapse without calling the clinic or indicating that they still wanted help. Their October 18 meeting did not

suffice to re-establish such a relationship. The Pards initiated the October 18 meeting because they feared that Michael would be jailed if he failed to comply with the court order requiring regular counseling. Stevens made it clear to the Pards on October 18 that he would not continue to meet with them because Michael needed more intensive therapy than the clinic could provide. The Pards acquiesced in Stevens' refusal, accepted the referrals to other practitioners, and made an appointment with the local psychiatrist. I, therefore, find that there was no patient-therapist relationship in October when Michael Pard attempted to kill his ex-wife and was injured by the police.

Even if a patient-therapist relationship had existed, I find that Stevens conduct was not negligent. The most credible experts testified that in their view it would not have been possible for Stevens to have committed Michael involuntarily to a hospital.

Michael had made many threats against Shirley during the period between December, 1978 and October 18, 1979. Stevens did not believe that Michael would carry them out because Michael seemed chastened after a night in jail, and Stevens believed the criminal justice system would curb his aggression. Nevertheless, Stevens did take steps to protect Shirley by calling her attorney the day after the October 18 meeting.

I therefore hold (1) that Michael Pard did not suffer from post traumatic stress disorder and that the acts of violence he committed against his ex-wife, which resulted in the injuries and damage he sustained, had no relationship to his war experiences or to any war-related illness; (2) that there was no patient-therapist relationship between Michael Pard and the VA at any time, and particularly not after April, 1979; and (3) that the VA was not guilty of any of the negligent acts charged against it by the Pards.

This opinion shall constitute findings of fact and conclusions of law in accordance

with Rule 52 of the Federal Rules of Civil Procedure.

Plaintiffs' action is dismissed, and a judgment in favor of the United States may be entered.