OPINION OF THE COURT
Edwin Margolis, J.
Trial of this action was bifurcated, and this decision deals only with the issue of damages. In our earlier decision (filed July 11, 1989) we found defendant liable for the injuries *636 suffered by claimant Mickey R. Cooper,* summarizing the event in which she was injured in the following manner: "Claimant was an employee of the food service company which operated the faculty dining room on the 10th floor of the Faculty Tower at the State University of New York College at New Paltz (SUNY). On April 24, 1984, she entered the east elevator at the concourse level of the Faculty Tower and pressed the 10th floor button. Three faculty members also boarded the car and got off at the 6th floor. According to claimant, the car then proceeded upwards to the 9th floor where it stopped. The doors did not open, and within seconds the elevator descended. Claimant pushed the alarm button on the elevator and 'the elevator jerked three, four, five, six times and I fell.’ She alleges that, as she fell to the floor, she hit the back of her head against a rail in the car. She testified that the elevator 'went down to — what I thought was the sixth or seventh floor and still, the doors didn’t open.’ The car then ascended to the 9th floor, where it remained for a period of time with the doors shut. Her testimony is that when the doors finally opened she observed that the car floor was several inches below the 9th floor level. She then crawled out from the car.”

Psychological Injuries

Immediately following her accident, claimant was reported to be quite tearful and upset, and she spent the following several days at home. Shortly after the accident, she began experiencing episodes later diagnosed as anxiety attacks. In May 1984 she reported to the Kingston Hospital emergency room complaining of vomiting, dizziness, shaking and difficulty sleeping. There were similar visits to the emergency room on August 4, September 7 and September 8, 1984. Testimony of claimant’s work supervisor, next door neighbor, and husband indicate that during this period claimant was increasingly nervous, depressed, anxious, and apprehensive about her accident. She had difficulty sleeping, experienced chest pains and feared that she would die. Eventually, claimant refused to leave her home (or, frequently, her bed), stopped performing her housework, refused to drive a car, and ceased all social activities. On September 9, 1984 she was admitted to Benedic *637 tine Hospital for treatment of these symptoms. When Dr. Fontera observed claimant at Benedictine Hospital, he described her as being "in distress” and "obviously suffering from an anxiety reaction”. She complained of chest pains and feared that she was having a heart attack. Dr. Fontera diagnosed a severe anxiety reaction.
While at Benedictine, claimant began receiving treatment from Dr. Chandrakant Amin, a board certified psychiatrist; she continues to be under his care. His diagnosis is that she suffers from "posttraumatic stress syndrome”, and he has treated this condition with medication, biofeedback, and psychotherapy. Although claimant’s condition has improved over the years, Dr. Amin testified that she continues to suffer from periodic anxiety attacks, remains highly emotional (crying, difficulty falling and staying asleep) and avoids situations that threaten to be similar to the one in which she was trapped. Dr. Amin’s notes and testimony indicate that he also considers claimant to have had a preexisting "anxious” personality pattern, as well as obsessive-compulsive features.
To support the testimony of Dr. Amin, counsel for claimant called Dr. Jeffrey Bernstein, a board certified psychiatrist, to testify on her behalf. Dr. Bernstein had initially been employed by the State to examine claimant as its independent medical expert; his report — rendered after an interview with claimant and a review of her medical records — also indicated that, in Dr. Bernstein’s opinion, claimant suffered from post-traumatic stress syndrome. The State ultimately retained another expert (discussed below), but claimant’s attorney chose to call Dr. Bernstein as well as his own expert. Dr. Bernstein testified that because claimant’s frequent panic attacks and other psychological symptoms (including avoidance of situations where escape may be difficult) began following the elevator incident, it was his opinion that they were caused by that event.
Defendant called Dr. Stephen Nozik, a licensed counseling psychologist who lectures on posttraumatic stress disorder and treats approximately 50 patients per year for that condition at Albany Veterans Administration Hospital. Dr. Nozik had tested and interviewed claimant for approximately one-half day shortly before the trial. In response to defense counsel’s question "as to whether Mickey Cooper suffered from post-traumatic stress disorder”, Dr. Nozik responded in the negative. On further questioning by the court, he characterized claimant’s condition as "a panic disorder with agoraphobia” *638 rather than posttraumatic stress syndrome, but also opined that her current psychological condition stemmed from the elevator incident.
It was also Dr. Nozik’s opinion, however, that claimant had preexisting personality characteristics which contributed or perhaps led to her reaction to the incident. These included an obsessive-compulsive personality, a tendency to be overly dependent on other persons, use of repression as a defense, conversion symptoms (translating mental conflict to physical discomfort) and phobia. He bases this opinion on his interview with claimant, the records of her treating psychiatrist, and psychological tests which he administered to claimant. Dr. Nozik testified that, in his opinion, claimant’s symptoms could be significantly improved with behavior therapy.
Claimant and her husband both testified that, while her condition has improved over the years, she continues to require constant medication, is treated by Dr. Amin about once a month, and suffers anxiety attacks approximately 10 times a month. As noted, claimant returned to work in November 1984 and has been continuously employed since then, but the couple state that their social life remains limited. Claimant rarely travels on her own beyond 7 or 8 miles from her home, but we note some testimony indicating that she did not travel on extended trips on her own even before the accident. She continues however to avoid situations where she will not be able to escape easily if stricken with a panic attack, although she has returned on at least one occasion to the top of the Faculty Tower and was able to ride, with her husband, in the elevator in the Justice Building during the course of this trial. There is some thread of exaggeration in the accounts claimant has given of her condition over the years, and on a number of occasions she has apparently given inaccurate or inconsistent accounts about what happened to her in the fall and about what she is or isn’t able to do in terms of normal life activities at different points. However, none of the medical examiners suggest — and the court does not find — that the over-all account given by claimant is entirely fabricated. In addition, confusion and exaggeration are often related to the type of psychological disorders which claimant has been diagnosed as having.
Posttraumatic stress disorder has been recognized since 1980 by the American Psychiatric Association as a syndrome which consists of an identifiable pattern of responses which can follow an intensely stressful event. Victims will typically *639 reexperience the traumatic event in a number of ways (dreams, flashbacks, hallucinations) and also experience intense distress at exposure to events that resemble or even symbolize the traumatic event. Eventually the victim will experience "persistent symptoms of increased arousal”, such as sleep difficulty, outbursts of anger and/or difficulty concentrating. (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 250 [3d ed rev 1987] [DSM III-R].) Among the "stressors” which have been recognized as being sufficiently traumatic to produce this syndrome are warfare, rape, repeated abuse particularly of children, or sudden and violent threat to life. (See, People v Taylor, 75 NY2d 277 [discussing rape trauma syndrome]; Small v Zelin, 152 AD2d 690 [automobile accident which left the victim trapped underwater by the body of another passenger]; Valdez v Church’s Fried Chicken, 683 F Supp 596 [WD Tex 1988] [sexual assault]; Pard v United States, 589 F Supp 518 [D Ore 1984] [wartime combat experiences].)
Posttraumatic stress disorder is one of a number of maladaptive responses to physical or emotional trauma. Phobic disorders (e.g., agoraphobia), panic disorders, obsessive-compulsive behavior and generalized anxiety disorders are other possible maladaptive responses and share many features and symptoms with posttraumatic stress disorder. (3 Attorneys’ Textbook of Medicine: Manual of Traumatic Injuries ch 42 [Matthew Bender 1990].) Recent studies indicate that instances of overwhelming terror may alter the brain chemistry of certain individuals, making them extremely sensitive to subsequent adrenaline surges, possibly explaining why some individuals may be prone to developing such disorders while others are relatively unaffected by similar trauma. (Goleman, A Key to Post-Traumatic Stress Lies in Brain Chemistry, Scientist Finds, NY Times, June 12, 1990, at C1.)
It is difficult for the court to comprehend that this claimant —a successful worker, wife and mother for many years — was as devastated as she indicates by the elevator malfunction which she experienced and the relative minor physical injury she suffered. Nevertheless, all medical experts agreed, on the basis of their testing and examination of claimant which in some cases have gone on over a period of years, that she does in fact suffer a maladaptive response to that event which continues to affect her life activities and her feelings of well-being. Whatever claimant’s emotional state and strength before the incident, the testimony of claimant, her husband and *640 those who know her provide sufficient evidence that there has been a marked and to some degree continuing change in her behavior and abilities since she was injured in the elevator.
Research has disclosed only one case in which the argument, here advanced by counsel for defendant, has been made that an individual’s personality characteristics prior to a traumatic event led, as much as the event itself, to the development of her present condition and should therefore reduce a defendant’s responsibility for that condition. In Valdez v Church’s Fried Chicken (683 F Supp 596, supra) the Federal District Court for the Western District of Texas held that where the victim did not suffer from posttraumatic stress syndrome prior to her assault by an employer, her preexisting psychological problems and marital difficulties which may have made her more vulnerable did not provide evidence that the syndrome was a "latent” condition. Thus, while it is possible to speculate that this claimant’s own psychological makeup contributed to or made more likely her development of such an extreme response to the incident, such speculation cannot absolve the State of its responsibility for her injury.
Accordingly, we find that claimant does in fact suffer from a condition — whether it is given the name of posttraumatic stress disorder, panic disorder, phobic reaction or some other term — which causes her to experience repeated anxiety attacks and limitation of some of her former activities and which was caused by the April 24, 1984 incident in which she was injured in the elevator malfunction. This is not to say, however, that all of her existing fears, repressions and phobias are necessarily a result of that incident, in view of the competent evidence that she exhibited a number of these traits prior to her injury. We find that the State’s negligence caused her psychological condition to alter and/or worsen in a marked degree, but we note that defendant is liable for compensating her only for those costs which will be incurred in returning her, if possible, to her situation prior to the incident and for the additional distress and limitation that she has experienced.
We find that claimant has made reasonable attempts to mitigate the harm caused by her condition and has not allowed it to remain essentially "untreated”. She has sought and continued to accept treatment, has cooperated in taking medication, and, in fact, has considerably improved in her ability to, for example, return to work, begin driving a car again, travel from her home, and engage in social activity. We *641 would anticipate that there will be continued improvement in the future and that claimant may well further benefit from the alternative therapy techniques suggested by Dr. Nozik.

Conclusion

We find that the physical and psychological conditions from which she continues to suffer and will continue to suffer to a lessening degree in the future entitles her to compensation in the amount of $90,000. While their effect is undoubtedly serious, we do not view claimant’s psychological injuries arising from the accident as having fully destroyed claimant’s way of life. The testimony indicated that prior to her injury she rarely traveled great distances from her home alone, that a significant part of her social life has been or could be resumed, and that her fears and anxieties arising from the April 24th incident have neither prevented her from being gainfully employed nor affected the level of such employment. On the other hand, we believe that claimant’s present condition will continue to require treatment — medication, psychotherapy, and possibly other forms such as behavior therapy, and we have considered that no amount of therapy will necessarily alleviate her symptoms in full and thus have added a factor for permanence.
[Portions of opinion omitted for purposes of publication.]

 The claim of Lance Cooper is derivative in nature. Unless otherwise indicated or required by the context, the term "claimant” shall refer to Mickey R. Cooper.