Pamela Denise
**MAHOMES–VINSON, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

Civ. A. No. 88–2357–0.

United States District Court,
D. Kansas.

Oct. 4, 1990.

Eugene B. Ralston, Ralston, Buck, Hayden & Diehl, Pedro Irigonegaray, Irigonegaray, Eye & Florez, Topeka, Kan., for plaintiff.

Benjamin L. Burgess, Jr., U.S. Atty., Janice Miller Karlin, Asst. U.S. Atty., Kansas City, Kan., for defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter comes before the court on defendants' motion for summary judgment. The government's summary judgment motion raises the five following issues: (1) whether the complaint filed by Pamela Denise Mahomes–Vinson (hereinafter "Mahomes–Vinson") states a claim for the negligent release of Nolan Prewett (hereinafter "Prewett"); (2) whether plaintiff's complaint states a claim for defendants' alleged failure to control Prewett; (3) whether a plaintiff may recover in excess of $250,000 in a medical malpractice case for "noneconomic loss" and in excess of $1,000,000 in total loss; (4) whether a plaintiff may recover in excess of $100,000 for the wrongful death of her children; and (5) whether the Veterans Administration (hereinafter "VA") or the Veterans Administration Medical Center (hereinafter "VAMC") are suable entities. For the reasons stated below, we will grant defendants' summary judgment motion in part.

## I. STATEMENT OF FACTS

Throughout the 1970's and early to mid 1980's, Prewett received both inpatient and outpatient treatment at VA medical centers in Arkansas, Oklahoma, Kansas, and Washington, D.C. During the course of his treatment, Prewett incessantly exhibited violent and sexually deviant behavior. He repeatedly attacked patients as well as members of his family. His medical records indicate that he attempted to commit suicide on several occasions, repeatedly threatened to kill people, and "inappropriately touched" patients and staff members.

Prewett frequently destroyed hospital furniture and stole property. Guns or knives were occasionally found in Prewett's possession. He also displayed recurring cruelty to pets. Prewett's former landlord, Alex Waszczyse (hereinafter "Waszczyse"), informed the VA in November of 1977 that he received several complaints from young girls in the neighborhood that his tenant had molested them. Waszczyse also reported that Prewett engaged in bizarre sexual behavior and exhibitionism. This information was again recorded in a neuropsychological evaluation conducted by the VA six months later. A medical report from Larned State Hospital describes Prewett's kidnapping of a woman in November of 1980. The report states that Prewett brandished a badge as well as a toy handgun when he identified himself as a police officer, forced himself into the victim's apartment, and said he was going to arrest her because there was a body at the base of her stairs. The report adds:

> She ran into the bathroom but [Prewett] kicked the door open and threw her to the floor. He broke a drinking glass and held it against her throat in a threatening manner, saying, "If you're not afraid of guns, maybe you're afraid of broken glass." He then gagged her, took her to another apartment and handcuffed her to a bed ... When she complained of being cold he told her he would go downstairs and chop up a table for firewood. Afraid of what he might do with an axe, she persuaded him to go for some cigarettes instead. When he left she was able to work herself loose and escape.

On November 7, 1980, Prewett was charged with aggravated burglary, aggravated assault, kidnapping, false impersonation, and criminal damage to property. He was admitted to Larned State Security Hospital (hereinafter "Larned") on Decem-

ber 24, 1980, to determine his competency to stand trial.

A Larned progress report dated March 18, 1981, notes that Prewett said he was a "baby raper" and "liked to fuck." A release summary, written in the same month at Larned, states that physical restraints were "very often" used on Prewett to prevent self-injury, harm to others, and property destruction. Dr. Kim–Giam Huynh, a physician at Larned, reported several months later that Prewett "is mentally ill, still in partial remission, [and] still can experience acute exacerbation with resulting dangerous behavior to himself or others." These records from Larned were available to Dr. John Cokley, the supervising physician who was ultimately responsible for discharging Prewett at the VAMC in Topeka, Kansas, but Dr. Cokley failed to read them.

On June 31, 1981, the District Court of Pawnee County, Kansas, adjudged Prewett a mentally ill person and ordered that "he should be forwarded to the Topeka State Hospital ... for treatment unless the Veterans Administration Hospital in Topeka ... consents to the acceptance of said patient." Prewett was transferred from Larned to Topeka State Hospital (hereinafter "Topeka State") on July 13, 1981. Venue was therefore changed from Pawnee County to Shawnee County, Kansas. Prewett was admitted to the Topeka VAMC on July 30, 1981. The Probate Division of the Kansas District Court in Pawnee County ordered a ninety-day review hearing to be held on September 24, 1981. On September 1, 1981, Topeka State filed a written notice to the court of "Change of Status." The notice indicated that Prewett had been discharged "To VA Hospital (where patient signed Vol.)."

Prewett was treated as an inpatient at the Topeka VAMC from July 30 to October 5, 1981. During the next five years, he visited the VAMC every two weeks for outpatient treatment. Prewett obtained medication and was evaluated by a health care professional at the time of his visits. He was cooperative in obtaining outpatient treatment and became a well-known psychiatric patient to the VAMC staff. Prewett also received inpatient treatment at the VA medical center in March of 1984, October and November of 1984, May of 1986, and July of 1986.

On July 19, 1986, eight days after he was discharged from the VAMC, Prewett raped, sodomized, and killed three-year-old Shavon Mahomes and six-year-old Shannon Mahomes. The bodies of the Mahomes girls were recovered the next day. That same day Prewett was charged with the crimes of rape, sodomy, and murder. On October 27, 1987, Prewett was convicted of these crimes. He is presently serving concurrent life sentences at Larned.

VA medical records indicate that Prewett's wife, Barbara, who was receiving treatment for mental illness at another hospital, stated on July 7, 1986, less than two weeks before the murders, that "her husband had fantasies about little girls." Dr. Cokley heard his patient spontaneously say, "I need to stay away from little girls." One month before his July 1986 discharge, Prewett experienced nightmares of combat scenes and seeing people being killed. Exactly one month before the murders, Prewett expressed a desire to purchase a shotgun for hunting. Dr. Thomas Scasz, a psychiatrist, opines that Prewett should have been involuntarily committed in July of 1986. Dr. Scasz also states that Shannon and Shavon Mahomes, as children in Prewett's neighborhood, were identifiable as potential targets at the time of his discharge on July 11, 1986.

## II.  SUMMARY JUDGMENT STANDARDS

In considering a motion for summary judgment, the court must examine all the evidence in a light most favorable to the nonmoving party. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir. 1981). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). If the moving party does not

bear the burden of proof, he must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden is met when the moving party identifies those portions of the record which demonstrate the absence of material fact. *Id.* at 323, 106 S.Ct. at 2552.

Once the moving party meets these requirements, the burden shifts to the party resisting the motion, who "must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (emphasis added). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations of denials of his pleading." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

## III. LIABILITY UNDER THE FEDERAL TORT CLAIMS ACT

The Federal Tort Claims Act (hereinafter "FTCA") is a limited waiver of sovereign immunity by the United States government which, with exceptions, provides a remedy in tort for persons injured by the negligence of government agents acting in the course and scope of their official duties. 28 U.S.C. § 2680. The FTCA directs that the law of the state in which the act or omission resulting in injury occurred be used to determine whether there is liability on the facts of the particular case. 28 U.S.C. § 1346(b). We will therefore apply the law of Kansas in ascertaining whether the defendants owed plaintiff a duty.

## IV. COMMITMENT OF PREWETT TO THE VA

■ Plaintiff asserts that Prewett's commitment status from July 31, 1981, until just days before the murders in 1986 must

be considered involuntary because of an order entered by the District Court of Pawnee County, Kansas on June 30, 1981. On that date, the district court adjudged Prewett a mentally ill person and ordered that "he should be forwarded to the Topeka State Hospital ... for treatment unless the Veterans Administration Hospital in Topeka ... consents to the acceptance of said patient." The VA accepted Prewett for treatment on July 31, 1981.

Under the law of Kansas, a district court is required to review a summary of an involuntary patient's medical records and determine by clear and convincing evidence whether that patient continues to suffer from a mental illness at the end of each ninety-day period of treatment. K.S.A. 59–2917a(a). If the court determines that there is insufficient evidence of continued mental illness, the patient must be discharged. *Id.* If the court finds that the patient continues to suffer from a mental illness, the court is required to "make a written determination as to whether the ... patient is in need of further treatment which cannot reasonably be provided in a treatment facility other than the state security hospital." K.S.A. 59–2917a(b).

In the instant case, no such written determinations were made by any court over the course of the five years in which plaintiff claims the commitment order remained in effect. In the absence of any further findings by the district court that Prewett was mentally ill, we cannot conclude Prewett was an involuntary patient beyond September 28, 1981, ninety days after the June 30 order of commitment. As the defendant points out, there is even a question as to whether Prewett was an involuntary patient on September 28. Topeka State notified the district court that Prewett's status had changed from involuntary to voluntary after only one month of treatment at its facility. On July 30, 1981, Prewett was *discharged* to the VA Hospital where he signed in voluntarily.[1]

---

1. Topeka State Hospital's notice to the court of the change in status states that Prewett was "Discharged. To VA Hospital (where patient signed Vol.)." Dr. Samuel Bradshaw, Chief of Psychiatry at the VA Hospital, testified that "vol." means "voluntary." The court is satisfied

## V. NEGLIGENT RELEASE OF VOLUNTARY PATIENT

■ Plaintiff alleges in the alternative that the United States, acting through the Department of Veterans Affairs, is liable under the statutory and common law of Kansas for the negligent release of Prewett as a voluntary patient at the VA hospital in Topeka. The precise issue of whether a VA hospital has a duty under Kansas law to prevent the release of a voluntary patient was the subject of a recent Tenth Circuit opinion—*Hokansen v. United States*, 868 F.2d 372 (10th Cir.1989). The *Hokansen* plaintiffs relied upon the Kansas Supreme Court's decision in *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983) in arguing that treating physicians at the VA hospital in Wichita, Kansas, negligently released a voluntary patient, Robert Garcia. The Tenth Circuit noted that the duty found to exist in *Durflinger* derived from Kansas' involuntary commitment statute. Since Garcia was a voluntary patient, the Tenth Circuit concluded in *Hokansen* that no duty was recognized in *Durflinger* to support plaintiff's cause of action.

Plaintiff contends nonetheless that she has a viable cause of action because the court in *Hokansen* was confronted with a different version of K.S.A. 59–2907 than was in effect at the time of Prewett's release. K.S.A.1989 Supp. 59–2907 provides voluntary patients with the right to be discharged from a treatment facility within three days of their written request.[2] An amendment in 1986 added the following language to the statute:

> Nothing in this act shall prevent the head of a treatment facility or other person from filing an application for determination of mental illness with respect to a voluntary patient who is refusing reasonable treatment efforts and is likely to cause harm to self or others if discharged.

K.S.A.1989 Supp. 59–2907. Plaintiff suggests that the legislature intended to encourage the involuntary commitment of voluntary patients by heads of treatment facilities who believed that the patients would cause harm to themselves or others.

This court has thoroughly reviewed the legislative history of the 1986 amendments to Chapter 59, Article 29 of the Kansas Statutes. The amendments were introduced in Substitute House Bill 2050 and entitled "An Act concerning care and treatment of mentally ill persons."[3] Dr. Robert Harder, Secretary of the Kansas Department of Social and Rehabilitation Services (hereinafter "SRS"), submitted a statement to the House Judiciary Committee in support of Sub. H.B. 2050. Dr. Harder noted that K.S.A. 59–2907 was amended merely to permit the involuntary commitment of voluntary patients who refuse reasonable treatment efforts but present a danger to themselves or others. R. Harder, *Statement at Hearing on Sub. H.B. 2050* 4 (Jan. 23, 1985).[4] In the absence of the amend-

---

that Dr. Bradshaw's reading of the abbreviation is the most reasonable interpretation.

2. Plaintiff contends that defendant had some duty to detain Prewett because Prewett did not *request in writing to be discharged pursuant to* K.S.A.1989 Supp. 59–2907. K.S.A. 59–2906, entitled "Discharge of a voluntary patient," requires the head of a treatment facility to discharge any voluntary patient whose treatment is determined to be no longer advisable. As the government notes in its reply brief, this statute makes no mention of the receipt of a written request. Plaintiff's argument must therefore fail. We are of the opinion that the head of a treatment facility may discharge a voluntary patient under Kansas law without soliciting a written request.

3. Civil commitment in Kansas is dependent upon a finding that a proposed patient is a "mentally ill person." *See* K.S.A. 59–2917 (court shall order treatment for persons found to be mentally ill). Debate therefore centered primarily on the Act's proposed definition of "mentally ill person." The proposed definition substituted "severe mental disorder" for "mentally impaired." A commentary on H.B. 2050 prepared by the Governor's Advisory Commission of Mental Health and Retardation Services indicates that the term "mentally ill person" was redefined simply to clarify and limit the Act's application to appropriate persons.

4. In light of Prewett's documented history of "aggressiveness, violence and sexual deviance," plaintiff asserts that defendant should have applied pursuant to the amended K.S.A. 59–2907 for a determination of mental illness with respect to Prewett. Even if Prewett posed a danger to himself or others, the amendment alone does not appear to provide defendant with authority to prevent the release of Prewett. Dr. Harder stated:

ment, Harder concludes that a treatment facility would be "left in the impossible position of maintaining the individual in the hospital without being able to treat." *Id.*

There is no indication that Prewett refused treatment from the defendant. To the contrary, Prewett was cooperative in obtaining outpatient treatment. He visited the hospital every two weeks between the Fall of 1981 and the Summer of 1986 in order to obtain medication. Prewett was evaluated by a health care professional at the time of his visits. During these five years, Prewett sought inpatient treatment for his mental illness on four separate occasions. We hold that the amendment of K.S.A. 59–2907 by the Kansas legislature in 1986 did not impose a duty on the defendant to apply for a determination of mental illness with regard to Nolan Prewett. The court will therefore grant defendants' summary judgment motion with regard to plaintiff's claim of negligent release.

## VI. SPECIAL RELATIONS GIVING RISE TO A DUTY

The existence and scope of a duty to a particular plaintiff is a question to be determined by the court as a matter of law. *Durflinger v. Artiles,* 234 Kan. 484, 488, 673 P.2d 86, 91 (1983). Ordinarily, there is no duty to control the conduct of another in order to protect a third person from harm. *Thies v. Cooper,* 243 Kan. 149, 151, 753 P.2d 1280, 1282 (1988); *see generally* Annot., 10 A.L.R.3d 619, § 3 (1966). A recognized exception to this general rule arises in the situation "where there is ... a *special relationship* between two persons which gives the one a definite control over the actions of another...." Harper &

Substitute for House Bill 2050 was never intended simply to make it easier to obtain commitments. This legislation ... does not seek to detain the "dangerously mentally ill" who have already committed overt acts of violence. Providing treatment to the latter usually arrives too late and tends to convert hospitals into detention centers.

R. Harder, *Statement at Hearing on Sub. H.B. 2050* 4 (Jan. 30, 1986). Secretary Harder added that Substitute House Bill 2050 broadens the scope of persons who may be committed for treatment but "affects only those who are suffering from a severe mental disorder to the extent

Kine, The Duty to Control the Conduct of Another, 43 Yale L.J. 886, 895 (1934) (emphasis added). Plaintiff alleges that liability may be premised on a special relationship between the V.A. doctors and their patient, Prewett.

There is no question that V.A. doctors had a definite, established, and continuing relationship with Nolan Prewett. With the exception of a few years, Prewett had continually received inpatient and outpatient treatment since 1970 for his mental condition at Veterans Administration medical facilities.[5] Prewett had been an inpatient at the VAMC in Topeka on a sporadic basis since 1975. During the five years preceding the murders, he was a long-term outpatient who visited the mental health clinic every two weeks. The government concedes that Prewett was a well-known psychiatric patient to the staff at the medical center. The threshold issue is whether liability may be imposed in Kansas as a result of this relationship.

Mahomes–Vinson directs the court's attention to the "special relation rule" enunciated in section 315 of *Restatement (Second) of Torts.* Section 315 states that there is a duty to control the conduct of a third person as to prevent him from causing physical harm to another when:

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives rise to the other a right to protection.

*Restatement (Second) of Torts* § 315 (1965). Since there appears to be no rela-

that they are unable to engage in a rational decision-making process regarding hospitalization or treatment." *Id.* at 10. Throughout Prewett's outpatient therapy before the murders, he appears to have been capable of engaging in a rational decision-making process as to treatment.

5. During two of the three years in which Prewett did not receive treatment from the Veterans Administration, he was either admitted to a state security hospital as a result of his mental illness or incarcerated at the Topeka jail.

tionship between the V.A. and the children murdered by Prewett, the court will limit its analysis to a discussion of the relationship between Prewett and those who treated him at the VA medical center.

In cases imposing liability for the failure to control the conduct of a third person, a party is charged with the duty of controlling the actions of the third person in light of a special relation between the two. *Bowling v. Popp*, 536 N.E.2d 511, 515 (Ind. App.1989); *Sports, Inc. v. Gilbert*, 431 N.E.2d 534, 538 (Ind.App.1982). Section 315(a) makes clear that, absent a special relationship between the actor and the third person, the actor has no duty to control the conduct of a third person and therefore no liability attaches for failure to control that person.[6] Examples of special relations giving rise to a duty to control include that of a parent-child, a master-servant, a possessor of land-licensee, and a person taking charge of others who have dangerous propensities. *See Restatement (Second) of Torts* §§ 316–19. Courts have increased the number of instances in which affirmative duties are imposed by expanding the list of special relationships. *See generally* J. Speiser, *The American Law*

*of Torts* § 4:11 (1983 & Supp.1987); W. Prosser, *Law of Torts* 348–50 (4th ed. 1971). Kansas courts have imposed the duty to control the conduct of others on employers and those in charge of persons with dangerous propensities.[7]

The Supreme Court of Kansas has made reference to section 315 on five occasions. *See Thies v. Cooper*, 243 Kan. 149, 151, 753 P.2d 1280, 1285 (1988); *Meyers v. Grubaugh*, 242 Kan. 716, 720, 750 P.2d 1031, 1034 (1988); *Akins v. Hamblin*, 237 Kan. 742, 746, 703 P.2d 771, 775 (1985); *Cansler v. State*, 234 Kan. 554, 559, 675 P.2d 57, 62 (1984); *Durflinger v. Artiles*, 234 Kan. 484, 499, 673 P.2d 86, 99 (1983).[8] In two of the Kansas cases, the court relied upon and quoted the Restatement in full. *Akins*, 237 Kan. at 746, 703 P.2d 771; *Cansler*, 234 Kan. at 559, 675 P.2d 57. In the context of a driver and passenger, the court has essentially adopted section 315 as the law of Kansas. *Akins v. Hamblin*, 237 Kan. at 773–75, 703 P.2d 771.[9] The court also recognized the Restatement as a general rule in *Theis v. Cooper*, 243 Kan. at 151, 753 P.2d 1280. A majority of jurisdictions have recognized a duty to control pursuant to section 315.[10] Under the Re-

---

6. The Supreme Court of Kansas previously quoted Comment b to § 315 which states in relevant part:

In the absence of either one of the kinds of special relations described in [§ 315], the actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm. This is true although the actor realizes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself.

*Akins v. Hamblin*, 237 Kan. 742, 746–47, 703 P.2d 771, 775 (1985) (quoting *Restatement (Second) of Torts* § 315 comment b (1965)).

7. In *Cansler v. State*, 234 Kan. 554, 564, 675 P.2d 57, 66 (1984), the Supreme Court of Kansas adopted the rule set forth in § 319 as the law governing the duty of those in charge of persons who have dangerous propensities. The court noted in *Meyers v. Grubaugh*, 242 Kan. 716, 724, 750 P.2d 1031, 1036 (1988) that § 317 imposes liability upon an employer for tortious acts of his employee only in limited circumstances, specifically if the employee is on the employer's premises or using the employer's chattel.

8. The special relationship theory was not properly raised on appeal in *Durflinger v. Artiles*, 234 Kan. 484, 499, 673 P.2d 86, 99 (1983) and *Hokansen v. United States*, 868 F.2d 372, 378–79 (10th Cir.1989).

9. In *Akins*, the appellant alleged that one passenger in an automobile owes other passengers or third parties a duty to control the operation of the motor vehicle. The court held that such a duty is recognized in Kansas only when the driver and passenger are involved in a special relationship or joint enterprise. *Akins*, 237 Kan. at 743, 703 P.2d 771. The court specifically stated that § 315 of the Restatement (Second) of Torts correctly follows Kansas law "where a passenger is riding as a guest in an automobile." *Id.* at 747, 703 P.2d 771.

10. *See, e.g. Brown v. Baltimore & Ohio R.R. Co.*, 805 F.2d 1133, 1138 (4th Cir.1986); *Sanchez v. United States*, 506 F.2d 702, 705 (10th Cir.1974); *Pard v. United States*, 589 F.Supp. 518, 525 (D.Or.1984); *Skeen v. Federative Republic of Brazil*, 566 F.Supp. 1414, 1419 (D.D.C.1983); *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185, 188 (D.Neb.1980); *Div. of Corrections v. Neakok*, 721 P.2d 1121, 1126 (D.Alaska 1986); *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal.3d 425, 434, 131

statement approach, the psychotherapist-patient relationship has been found to be a sufficient basis for imposing an affirmative duty on the therapist for the benefit of third persons. *See, e.g., Naidu v. Laird,* 539 A.2d 1064 (Del.1988) (psychiatrist-discharged mental patient); *Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 296 S.E.2d 693 (1982) (mental health hospital-outpatient); *Evans v. Morehead Clinic,* 749 S.W.2d 696 (Ky.1988) (psychotherapist-discharged mental patient); *Duvall v. Goldin,* 139 Mich.App. 342, 362 N.W.2d 275 (1984) (psychiatrist-outpatient); *Littleton v. Good Samaritan Hosp.,* 39 Ohio St.3d 86, 529 N.E.2d 449 (1988) (psychiatrist-outpatient); *Peck v. Counseling Serv.,* 146 Vt. 61, 499 A.2d 422 (1985) (mental health hospital/counselor-outpatient). *Cf. Hasenei v. United States,* 541 F.Supp. 999 (D.Md. 1982) (psychiatrist-outpatient); *Fischer v. Metcalf,* 543 So.2d 785 (Fla.Dist.Ct.App. 1989) (psychiatrist-outpatient).[11]

The seminal case regarding the duty of a psychiatrist to protect against the conduct of a patient is *Tarasoff v. Regents of Univ.* *of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).[12] In *Tarasoff,* the parents of a decedent brought suit against a hospital on grounds that the decedent's killer had confided his intentions to kill the decedent to his therapist, Dr. Lawrence Moore, but the therapist did not warn the decedent. *Id.* 131 Cal.Rptr. at 20, 551 P.2d at 340. Although the factual circumstances were limited to a situation where the therapist knew the patient's intention, the California Supreme Court's holding encompasses situations where the therapist, under applicable professional standards, reasonably should have determined that a patient poses a serious danger of violence to others. *Id.* 131 Cal.Rptr. at 25, 551 P.2d at 345.

The court, applying section 315 of the Restatement to the facts before it, held:

Once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a risk of violence to others, he bears a duty to exercise reasonable care to protect the

Cal.Rptr. 14, 22, 551 P.2d 334, 343 (1976); *Leake v. Cain,* 720 P.2d 152, 160 (Colo.1986); *Naidu v. Laird,* 539 A.2d 1064, 1072 (Del.1988); *Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 296 S.E.2d 693, 696 (1982); *Seibel v. City & County,* 61 Haw. 253, 257–58, 602 P.2d 532, 536 (1979); *Sterling v. Bloom,* 111 Idaho 211, 244, 723 P.2d 755, 788 (1986); *Cross v. Chicago Hous. Auth.,* 74 Ill.App.3d 921, 30 Ill.Dec. 544, 547–48, 393 N.E.2d 580, 583–84 (1979), *aff'd* 82 Ill.2d 313, 45 Ill.Dec. 121, 412 N.E.2d 472 (1980); *Maroon v. Ind. Dep't of Mental Health,* 411 N.E.2d 404, 414 (Ind.App.1980); *Evans v. Morehead Clinic,* 749 S.W.2d 696, 699 (Ky.App.1988); *Atkins v. Frazell,* 470 So.2d 505, 509 (La.Ct.App.1985); *Ashburn v. Anne Arundel Co.,* 306 Md. 617, 628, 510 A.2d 1078, 1083 (1986); *Duvall v. Goldin,* 139 Mich.App. 342, 362 N.W.2d 275, 278 (1984); *Lundgren v. Fultz,* 354 N.W.2d 25, 27 (Minn. 1984); *McIntosh v. Milano,* 168 N.J.Super. 466, 403 A.2d 500, 508–09 (1979); *Karbel v. Francis,* 103 N.M. 468, 470, 709 P.2d 190, 192 (1985); *Schrempf v. State,* 486 N.Y.S.2d 1010, 1011, 107 A.D.2d 1042 (1985); *Littleton v. Good Samaritan Hosp.,* 39 Ohio St.3d 86, 92, 529 N.E.2d 449, 455 (1988); *Barger v. Cox,* 372 N.W.2d 161, 167 (S.D.1985); *Owens v. Garfield,* 784 P.2d 1187, 1189 (Utah 1989); *Peck v. Counseling Serv.,* 146 Vt. 61, 64, 499 A.2d 422, 425 (1985); *Marshall v. Winston,* 389 S.E.2d 902, 904, 239 Va. 315 (1990); *Petersen v. State,* 100 Wash.2d 421, 426–28, 671 P.2d 230, 236 (1983); *Mostert v. CBL & Assoc.,* 741 P.2d 1090, 1106 (Wyo.1987); *see also*

*Fitzpatrick v. Iowa Bd. of Parole,* 439 N.W.2d 663, 667 (Iowa 1989) (duty to control actionable only when there is a special relationship); *Cook v. School Dist. UH3J,* 83 Or.App. 292, 294, 731 P.2d 443, 444 (1987) (duty to protect from reasonably foreseeable acts of third parties); *Korenak v. Curative Workshop,* 71 Wis.2d 77, 237 N.W.2d 43, 46 (1976) (defendant liable regardless of whether appellant in custody).

11. The government urges the court to consider a host of policy reasons with regard to third-party liability such as the social utility of the actor's conduct, the magnitude of the burden guarding against injury, and the consequences of placing that burden upon the actor. As plaintiff notes, however, there is no indication that "the fears expressed by defendant have come true" in the jurisdictions that have adopted the special relationship theory.

12. On rehearing the *Tarasoff* court vacated its previous decision at 118 Cal.Rptr. 129, 529 P.2d 553 (1974). The first decision held that a therapist who had reason to believe that a patient would harm a person had a duty to warn the potential victim. 118 Cal.Rptr. at 131, 529 P.2d at 555. As noted below, the second decision held that the therapist had a duty to act reasonably under the circumstances, which could be discharged in several ways, including a warning. 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).

foreseeable victim of that danger. While the discharge of this duty will necessarily vary with the facts of each case, in each instance the adequacy of the therapist's conduct must be measured against the traditional negligence standard of the rendition of reasonable care under the circumstances.

*Id.* The court reasoned that the "special relation," as discussed in the Restatement, of a patient and his doctor or psychotherapist had arisen between the killer and the therapists. *Id.* 131 Cal.Rptr. at 23–24, 551 P.2d at 343–44.[13] This special relation gave rise to affirmative duties for the benefit of the victim. Therefore, the court concluded that the decedent's parents had a cause of action against the therapists for failure to exercise reasonable care to protect the decedent. *Id.* 131 Cal.Rptr. at 34, 551 P.2d at 354.

The clearest adoption of *Tarasoff* in another jurisdiction has been in New Jersey. *See McIntosh v. Milano,* 168 N.J.Super. 466, 403 A.2d 500 (1979). In *McIntosh,* a wrongful death action was brought against a psychiatrist whose patient murdered the plaintiff's daughter. The patient, who was receiving treatment on a weekly basis, told the psychiatrist of violent fantasies, ownership of a knife he used to frighten people, and a possessive relationship with the victim. The patient, however, never made any direct threats concerning the victim. The plaintiff argued that the psychiatrist had sufficient information to determine the patient was dangerous and the victim was the object of his aggression. Therefore, the psychiatrist had a duty to warn the victim about the patient. *Id.* 403 A.2d at 505.

In reversing the trial court's grant of summary judgment in favor of the defendant, the New Jersey Supreme Court followed *Tarasoff, supra,* and adopted section 315 of the Restatement. *Id.* 403 A.2d at 509. The court held that a psychiatrist has

a duty to protect an intended or potential victim of his patient when he determines or should determine under the facts and under the standards of his profession that the patient is or may be a danger to the victim. *Id.* at 511–12. The question of whether or not there was a breach of this duty was an issue of fact. *Id.* at 511.

A federal district court in Nebraska, citing both *Tarasoff, supra,* and *McIntosh, supra,* adopted section 315. *See Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185 (D.Neb.1980). In *Lipari,* a mental patient was receiving day care from the Veterans Administration. Against the advice of his doctors, the patient stopped attending therapy, and shortly thereafter shot two individuals in a crowded night club. The plaintiff sought to hold the VA hospital treating the patient liable for failing to detain him or involuntarily commit him.

Relying on section 315, the court held that the special relationship of a psychotherapist and his patient gives rise to a duty to take whatever precautions are necessary to protect potential victims of the patient. *Id.* at 191. Thus, the precautions under appropriate circumstances may include a duty to detain. The court reasoned that a psychiatrist or therapist has a duty to third persons when he or she knows or should know that the patient has dangerous tendencies. *Id.* at 193. The *Lipari* court explicitly rejected the "readily identifiable" victim limitation, and stated that the therapist's duty extends not only to those third parties specifically known to the therapist, but also to those for whom the therapist could have reasonably foreseen an unreasonable risk of harm. *Id.* at 194.

We believe that the Supreme Court of Kansas would also consider foreseeability in determining whether to impose liability under section 315 of the Restatement.[14] In

---

13. The California Supreme Court has continued to quote from and apply § 315 of the Restatement. *See Peterson v. San Francisco Community College Dist.,* 205 Cal.Rptr. 842, 685 P.2d 1193, 1196 (1984); *Davidson v. City of Westminster,* 185 Cal.Rptr. 252, 649 P.2d 894, 897 (1982).

14. Some courts have also held that a duty to control may only be imposed where the party upon whom the duty has been imposed has the ability or right to control the conduct of the third person. *See Currie v. United States,* 836 F.2d 209, 212 (4th Cir.1987); *Sports v. Gilbert,* 431 N.E.2d 534, 538 (Ind.Ct.App.1982). While

*Robertson v. City of Topeka*, 231 Kan. 358, 644 P.2d 458 (1982), the court discussed the concept of special relationship and held that a police officer was not liable for the acts of an intoxicated person, absent some special relationship with or specific duty owed the party injured by the intoxicated person's acts. 231 Kan. at 363, 644 P.2d 458. The court stated that a special relationship exists when one creates a *foreseeable* peril, not readily discoverable, and fails to warn. 231 Kan. at 364, 644 P.2d 458 (emphasis added).

The authorities cited above lead this court to conclude that plaintiff has a cause of action under Kansas law. After carefully considering the relevant case law, as well as the arguments of each party, we are of the opinion that the Kansas Supreme Court would adopt the section 315 Restatement approach and limit the liability of defendant to those persons who were foreseeably endangered by the alleged negligence of the VA. Thus, Mahomes–Vinson must establish that the VA psychiatrists or therapists who treated Nolan Prewett should have determined under the applicable standards of their profession that Prewett posed an unreasonable risk of harm to Shannon and Shavon Mahomes, or a class of persons of which the Mahomes children were members. In order to satisfy this standard, plaintiff need not necessarily prove that the VA employees actually knew the identity of plaintiff's decedents.

The question of whether the VA's employees should have foreseen the unreasonable risk of harm to third persons is a fact issue. This court has no trouble concluding at this stage in the litigation that genuine issues of material fact exist. Plaintiff described ninety incidents involving sexual deviance or violent behavior on the part of Prewett since he began receiving treatment from the Veterans Administration. While many of these events occurred years be-

fore the murders and some of plaintiff's descriptions are a bit exaggerated, we believe Prewett's behavior in several instances, when viewed in a light most favorable to plaintiff, reveals that he was a foreseeable risk to young children, particularly girls, in his neighborhood.

Prewett's wife stated on July 7, 1986, less than two weeks before the murders, that "her husband had fantasies about little girls." Plaintiff contends that somebody at the VA hospital should have at least contacted Prewett's wife in pursuit of further information. One month before his July 1986 discharge, Prewett experienced nightmares of combat scenes and seeing people being killed. Shortly thereafter Prewett expressed a desire to purchase a shot gun.

Prewett stated in March of 1981 that he was a "baby raper" and "liked to fuck." The VA was informed in November of 1977 that Prewett may have molested several young girls in his neighborhood. Prewett's deviant sexual behavior and exhibitionism was also reported to the VA. Prewett's medical records indicate that he attempted to commit suicide on several occasions, repeatedly attacked and threatened to kill people, and "inappropriately touched" patients and staff members. Dr. John Cokley, the supervising physician who was ultimately responsible for discharging Prewett, heard his patient spontaneously say, "I need to stay away from little girls." The records containing Prewett's background were available to Dr. Cokley, but he failed to review them. Questions of fact remain as to the government's duty to control. Defendant's summary judgment motion as to the duty to control will be denied.

## VII. CONSTITUTIONALITY OF K.S.A. 60–3407(a)

■ The government contends that the limitations upon noneconomic damages con-

---

there is no indication that Kansas courts would adopt this limitation, there is no question that defendant had the ability to control Prewett. K.S.A. 59–2909 makes it clear that persons working at a treatment facility may file an application for the admission and detainment of any individual for emergency observation and treatment who is believed to be likely to cause

harm to himself or others. The VA's supervising physician who had the ultimate responsibility for determining whether to discharge Prewett on July 11, 1986, eight days before the murders, conceded that he had the "duty and responsibility" of not releasing patients into the community if they pose a danger to themselves or others.

tained in K.S.A.1989 Supp. 60–3407(a) apply to this case.[15] K.S.A. 60–3407(a) provides for the following limitations in medical malpractice actions:

> (1) The total amount recoverable by each party from all defendants for all claims for noneconomic loss ... shall not exceed a sum total of $250,000; and
>
> (2) subject to K.S.A.1987 Supp. 60–3411, the total amount recoverable by each party from all defendants for all claims shall not exceed a sum total of $1,000,000.

The Kansas Supreme Court held, however, that these limitations are an invasion on the jury's determination of the facts, and, thus, violate the right to jury trial guaranteed by section 5 of the Kansas Constitution. *Kansas Malpractice Victims v. Bell*, 243 Kan. 333, 346, 757 P.2d 251, 269 (1988).

The government argues that *Bell* was implicitly overruled in the subsequent decisions of *Samsel v. Wheeler Trans. Serv., Inc.*, 246 Kan. 336, 789 P.2d 541 (1990), and *Leiker v. Gafford*, 245 Kan. 325, 778 P.2d 823 (1989). The precise issue of whether these Kansas cases overrule *Bell* was addressed by our colleague, Judge Crow, on two separate occasions. *See McReynolds v. Bigler*, No. 88–1343–C, 1990 WL 112969 (D.Kan. July 5, 1990); *McReynolds v. Bigler*, No. 88–1343–C, 1989 WL 134942 (D.Kan. Oct. 23, 1989). Before the full opinion in *Samsel* was issued, Judge Crow stated:

> The Kansas Supreme Court has not given any overt signs of overruling the *Bell* decision. While the statutes addressed in *Bell* and *Samsel* share the common effect of limiting a plaintiff's full recovery in a tort action, the apparent scope and purpose of these legislative measures are distinct. The court in *Bell* focused on whether the medical malpractice plaintiff was given an adequate substitute remedy, *quid pro quo*, for the loss of the constitutional right to remedy by due course of law. The court was not satisfied that the availability of quality health care was an adequate substitute

remedy when the source of recovery for a medical malpractice plaintiff was already provided by the statutes requiring mandatory malpractice insurance. [*Malpractice Victims,*] 243 Kan. at 351–52 [757 P.2d 251]. The statutory provision in *Samsel* limits recovery in all personal injury actions, except for medical malpractice actions. The factors in balancing the *quid pro quo* relationship will not necessarily be the same as those discussed in *Bell.*

*McReynolds v. Bigler*, No. 88–1343–C, 1989 WL 134942 (D.Kan. Oct. 23, 1989). After the full opinion in *Samsel* was issued, Judge Crow added:

> [T]he Kansas Supreme Court went to great lengths to avoid overruling the *Bell* decision. Indeed, Justice Lockett in the majority opinion concluded that their holding was "consistent" with *Bell* ... Nothing appears to have prevented the court from saying the holding in *Bell* on statutory caps for noneconomic losses under K.S.A.1987 Supp. 60–3407 is overruled, other than its respect for precedent or some unexplained reason for distinguishing the relevant statutes and purposes.

*McReynolds v. Bigler*, No. 88–1343–C, 1990 WL 112969 (D.Kan. July 5, 1990). This court is convinced that the Kansas Supreme Court has not overruled *Bell.* Accordingly, we will treat *Bell* as viable precedential authority that the statutory caps in K.S.A.1987 Supp. 60–3407 are unconstitutional.

## VIII. DAMAGES IN A WRONGFUL DEATH ACTION

### A. *Non–Pecuniary Loss*

■ The United States contends that plaintiff's complaint for damages arising out of the wrongful death of her children should be dismissed pursuant to K.S.A. 60–1903, because Mahomes–Vinson requests amounts in excess of $100,000. K.S.A. 60–1903 provides:

**15.** The *Durflinger* case indicates that this case is properly characterized as a medical malpractice action. *See Durflinger v. Artiles,* 234 Kan. 484, 488, 673 P.2d 86, 91 (1983).

(a) In any wrongful death action, the court or jury may award such damages as are found to be fair and just under all the circumstances, but the damages, other than pecuniary loss sustained by an heir at law, cannot exceed in the aggregate the sum of $100,000 and costs.

The constitutionality of this statute was upheld in *Leiker v. Gafford*, 245 Kan. 325, 778 P.2d 823 (1989).[16]

Plaintiff does not suggest that she is entitled to recover damages in excess of $100,000 in her wrongful death action. Mahomes–Vinson simply states that she must be permitted to allege damages in excess of $100,000 before the trier of facts determines the total non-pecuniary damages actually sustained by plaintiff. Mahomes–Vinson argues that she otherwise would recover only a percentage of the $100,000 cap after application of Kansas' comparative fault statute. We agree with plaintiff.

If the trier of fact finds plaintiff or her deceased daughters negligent in a specific percentage and also finds damages in excess of $100,000, the figure returned by the trier of facts will be diminished in proportion to the degree of negligence. If the figure then arrived at is in excess of $100,-000, plaintiff will be allowed to recover $100,000. *See* K.S.A. 60–1903(b); *Benton v. Union Pac. R.R. Co.*, 430 F.Supp. 1380, 1386 (D.Kan.1977) (wrongful death limitation is not measure of damages sustained but limitation on damages recoverable). Defendant's motion to dismiss plaintiff's complaint on grounds that it requests damages in excess of $100,000 is denied.

### B. *Pecuniary Loss*

■ Plaintiff claims she sustained pecuniary damages in the form of death and funeral expenses, as well as loss of her daughters' services, care and guidance. It cannot be seriously disputed that the death and funeral expenses are pecuniary in nature.[17] Defendant, however, asserts that there is insufficient proof to support an award of pecuniary damages for any money, services or other material benefits that the deceased children would have provided plaintiff.

Mahomes–Vinson is not required to prove her losses with mathematical certainty. The "better and more equitable rule" provides that the burden of proof is satisfied simply through a showing of the nature and extent of the losses asserted. *Wentling v. Med. Anesthesia Serv.*, 237 Kan. 503, 510–12, 701 P.2d 939, 945–47 (1985). The trier of facts may estimate the value of such losses based on testimony at trial. *Id.* at 512, 701 P.2d 939. We cannot conclude at this point that the mother of Shavon and Shannon Mahomes would not at some future date be pecuniarily advantaged by the continued life of her two daughters. *See Brick Co. v. Fisher*, 79 Kan. 576, 582–83, 100 P. 507, 512 (1909) (jury may compute parents' pecuniary benefits from continued life of son). The court will therefore deny defendants' motion to dismiss plaintiff's complaint for damages.

### IX. AUTHORITY TO SUE A FEDERAL AGENCY IN ITS OWN NAME

■ The government contends that plaintiff has improperly joined three defendants by naming a federal agency—the Veterans Administration—and a facility of that agency—the Veterans Administration Medical Center—as defendants in this lawsuit. Plaintiff does not contest that her joinder of the three governmental entities

---

**16.** More specifically, the Kansas Supreme Court concluded that the damage cap imposed by K.S.A.1988 Supp. 60–1903 did not violate the appellees state constitutional rights to remedy by due course of law, trial by jury, and equal protection of the law. *Leiker v. Gafford,* 245 Kan. 325, 365, 778 P.2d 823, 850 (1989).

**17.** Defendants' argument that Mahomes–Vinson cannot recover pecuniary damages for death and funeral expenses because these costs were covered by a memorial fund is without merit. Benefits received by a plaintiff " 'from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer.' " *Allman v. Holleman,* 233 Kan. 781, 788, 667 P.2d 296, 302 (1983) (quoting *Pape v. Kansas Power & Light Co.,* 231 Kan. 441, 446, 647 P.2d 320, 324 (1982)).

is improper. Subsection (a) of 28 U.S.C. § 2679 states:

> The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

Neither the VA nor the VAMC are amenable to suit under the Federal Torts Claim Act. *Allen v. Veterans Admin.*, 749 F.2d 1386, 1388 (9th Cir.1984); *Evans v. United States Veterans Admin. Hosp.*, 391 F.2d 261, 262 (2d Cir.1968), *cert. denied*, 393 U.S. 1040, 89 S.Ct. 667, 21 L.Ed.2d 589 (1969); *see also Blackmar v. Guerre*, 342 U.S. 512, 515, 72 S.Ct. 410, 411, 96 L.Ed. 534 (1952) (Civil Service Commission not suable entity). Accordingly, we will dismiss plaintiff's complaint against these two defendants.

IT IS THEREFORE ORDERED that defendant's summary judgment motion (Doc. #81) as to plaintiff's claim of negligent release is hereby granted.

IT IS FURTHER ORDERED that plaintiff's claims against the Veterans Administration and the Veterans Administration Medical Center are dismissed.

IT IS FURTHER ORDERED that plaintiff may allege but not recover non-pecuniary damages in excess of $100,000 in her wrongful death action. Plaintiff may allege pecuniary losses for death and funeral expenses as well as for her daughters' services, care, and guidance.

IT IS FURTHER ORDERED that defendant's motion for summary judgment (Doc. #81) with regard to the United States' duty to control is denied.

IT IS FURTHER ORDERED that defendant's summary judgment motion (Doc. #81) as to the constitutionality of K.S.A. 1987 Supp. 60-3407(a) is denied.