No. 99,195

KATHERINE ADAMS, *Appellant*, v. BOARD OF SEDGWICK COUNTY COMMISSIONERS, *Appellee/Cross-appellant*, and GARRY PORTER, M.D., and JOAN HERTLEIN, *Appellees*. ALEXANDRA PAIGE CUMMINS, *Appellant/Cross-appellee*, v. BOARD OF SEDGWICK COUNTY COMMISSIONERS, *Appellee/Cross-appellant*.

(214 P.3d 1173)

Opinion filed September 4, 2009.

*David P. Calvert,* of David P. Calvert, P.A., of Wichita, argued the cause and was on the briefs for appellants/cross-appellee.

*Lisa A. McPherson,* of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause, and *Marcia A. Wood,* of the same firm, was with her on the briefs for appellee/cross-appellant Board of Sedgwick County Commissioners.

*Trevin E. Wray*, of Holbrook & Osborn, P.A., of Overland Park, argued the cause, and *Lawrence J. Logback*, of the same firm, was with him on the briefs for appellee Garry Porter, M.D.

*Christopher A. McElgunn*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C, of Wichita, argued the cause, and *Gary M. Austerman*, of the same firm, was with him on the briefs for appellee Joan Hertlein.

*Robert E. Keeshan* and *William Rein*, of Scott, Quinlan, Willard, Barnes & Keeshan, LLC, of Topeka, were on the brief for *amicus curiae* Kansas Association for Justice.

*David R. Cooper*, *Teresa L. Watson*, and *J. Steven Pigg*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, were on the brief for *amicus curiae* Kansas Association of Counties.

The opinion of the court was delivered by

LUCKERT, J.: In this appeal, we hold that an outpatient mental health center and its employees did not owe a duty to those injured by a psychiatric patient who became violent 9 months after an outpatient treatment order was allowed to expire, even though there existed a basis for the continuation of the order. We conclude that an outpatient mental health treatment facility does not take charge of an outpatient subject to an outpatient treatment order in a manner that gives rise to a duty to control the outpatient's conduct or to protect others from the outpatient.

Because no duty arose, we do not consider the question of whether an exception to liability exists because of the discretionary function exception to the Kansas Tort Claims Act (KTCA), K.S.A. 2008 Supp. 75-6104(e), which served as the basis for the district court's grant of summary judgment.

### Facts and Procedural Background

Katherine Adams and her granddaughter Alexandra Cummins (the Plaintiffs) brought suits against the Board of Sedgwick County Commissioners and several mental health care professionals after Adam Cummins, Katherine's son and Alexandra's father, attacked Katherine with a hammer. In an effort to save her grandmother's life, Alexandra fatally shot her father.

During the 3-year period before this tragic incident, Adam had been treated at ComCare, a mental health agency operated by

Sedgwick County, Kansas. Adam was first seen at ComCare in 1997 after he was discharged from inpatient treatment at the Topeka State Hospital (TSH). Adam's admission to the TSH was triggered by his threats to kill family members, and while there he was diagnosed with "bipolar disorder, manic with psychotic features." Later, he was diagnosed with "[s]chizophrenia, depressive type, continuous with prominent negative features, polysubstance abuse, personality disorder, NOS [not otherwise specified] with antisocial and dependent features."

Upon release from the TSH and while under the care of ComCare, a cycle began that repeated itself several times: Shortly after discharge from inpatient treatment, Adam would refuse to take his medications, and Adam's mental health would gradually deteriorate. He would become less compliant with the suggested treatment regimen; he would avoid one-on-one contact with his ComCare case managers; he would fail to keep appointments with various ComCare employees; and his behavior would become more hostile and threatening. On at least two occasions, Adam's threats of violence resulted in him being hospitalized. He received court-ordered treatment at Osawatomie State Hospital (OSH) beginning in November 1997 and, for the final time, beginning in May 1999. With each hospitalization, the cycle would come full circle and then begin anew—Adam would stabilize, be discharged, refuse medications, and eventually threaten violence.

ComCare's records relating to treatment before Adam's final hospitalization, which began in May 1999, reflect this cycle, as well as individual practitioner's concerns about Adam's refusal to take medications and his potential for violence. These pre-May 1999 records also reflect that on occasion Katherine called ComCare to express her concerns for and about her son and his behavior. As a result of these contacts and because of other information, ComCare's employees were aware that Adam had threatened Katherine, other family members, social workers, and others on several occasions.

The allegations in this case relate to the cycle that began in May 1999 with Adam's court-ordered—*i.e.*, involuntary—hospitalization at OSH. Adam was released from inpatient hospitalization at

OSH in July 1999 and placed in outpatient therapy at ComCare. On July 20, 1999, which was several days after Adam's discharge from OSH, the district court entered an outpatient treatment order. The court ordered that Adam:

"Shall comply with all directives and treatment as required by the treatment staff of the outpatient treatment facility;

"Shall take all medications prescribed without making any changes prior to authorization by the Outpatient Medicine Clinic Staff;

"Shall keep scheduled appointments with the Outpatient Medicine Clinic;

"Shall report use of any medication prescribed by other physicians;

"Shall abstain from using alcohol or illegally obtained drugs;

"Shall submit to random drug testing when requested by Outpatient Medicine Clinic;

"Shall meet with his designated Case Manager, Crisis or Homeless Team Staff member as scheduled; . . .

"Shall attend Day Treatment Program when recommended by clinical staff;

"Shall take all prescribed medications in the presence of the Outpatient Medicine Clinic Physician;

"Shall submit himself for lab work as prescribed by the Outpatient Medicine Clinic Staff."

The order also required ComCare to immediately report to the district court any noncompliance by Adam with the terms of the order.

Even before this outpatient treatment order was entered, Adam's reluctance to take his medications was reflected in a note made by Dr. Garry Porter, a ComCare employee, who wrote that Adam was trying to "chisel down" his medications. Then, 2 days after the outpatient treatment order was entered, Dr. Porter noted that Adam was not taking all his prescribed medications. Dr. Porter notified Adam's case manager about the noncompliance and "assumed" that the noncompliance had been reported to the district court. In fact, the noncompliance was not reported.

On August 13, 1999, ComCare issued a report recommending that the involuntary outpatient care and the treatment order be allowed to expire. The report indicated that Adam was compliant with physician appointments, was taking his medications, and was meeting with his case manager. It was signed by nurse practitioner Joan Hertlein on behalf of Dr. Porter, who testified he had never

seen the report. The involuntary treatment order expired on August 27, 1999.

Adam voluntarily saw Dr. Porter on September 10, 1999. At that time, Dr. Porter noted Adam had "taken himself off all his meds," and Adam stated he "feels much better" and "denies any aggressivity." Dr. Porter's diagnosis stated that Adam was "in partial remission" and that he had not heard anything from Adam's family members recently. The following month, Adam's ComCare case manager recommended that Adam's case be closed to all services because of his refusal of ComCare's services and being noncompliant with any services.

By April 2000, Adam's condition had noticeably deteriorated, and on May 15, 2000—almost 9 months after the involuntary order had expired and 6 months after Adam had last been treated at ComCare—Adam became angry with Katherine and placed several phone calls to her home number, leaving messages that frightened both Katherine and Alexandra. They reported Adam's behavior to the police, who told them to keep their doors locked but did nothing else.

Several hours later, Adam arrived at Katherine's home and kicked down the door. Tragically, this time the threats of violence became a reality as Adam beat Katherine's head and face with a hammer, leading Alexandra to fire the fatal shot that killed her father. Katherine sustained serious head injuries and permanent disabilities as a result of Adam's attack.

This incident led to separate lawsuits being filed by Katherine and Alexandra. Katherine sued the Board of Sedgwick County Commissioners (County), Dr. Porter, and Hertlein (referred to collectively as Defendants) (Case No. 05-CV-1927). Alexandra sued only the County (Case No. 05-CV-1926). Although Katherine and Alexandra did not sue the same parties, their allegations relating to the Defendants' duty to them and the basis for their claims of breach of duty were identical. As stated in Katherine's petition, they allege:

"9. The Defendants had a duty to control the conduct of Adam Scott Cummins so as to prevent him from causing physical harm to the Plaintiff because:

    a. A special relation existed between the Defendants and Cummins which imposed a duty upon the Defendants to control the conduct of Cummins; and

    b. A special relation existed between the Defendants and the Plaintiff which gave rise to the Plaintiff a right of protection.

"10. The Defendants, individually and through the agents and employees of ComCare, were negligent in the treatment of Adam Scott Cummins as follows:

    a. The Defendants determined or should have determined, under applicable professional standards, that Adam Scott Cummins posed a risk of violence to the Plaintiff;

    b. The Defendants had a duty to exercise reasonable care to protect the Plaintiff who was the foreseeable victim of that danger; and

    c. The Defendants had a duty to protect the Plaintiff (the intended or potential victim of its patient) when it determined or should have determined under the facts and under the standards of the profession that the patient was or might have been a danger to the Plaintiff."

The Defendants answered and, among other things, alleged that they did not owe a duty to the Plaintiffs and that they were immune from liability under K.S.A. 2008 Supp. 75-6104(e), the discretionary function exception to the KTCA, because any decisions made by ComCare with respect to Adam's treatment were discretionary acts. Eventually, the Defendants sought summary judgment, making the same arguments and also arguing the uncontroverted facts established that the Defendants' actions did not cause the Plaintiffs' injuries.

The district court granted summary judgment in favor of the Defendants. The court did not focus on whether there was a duty owed specifically to the Plaintiffs but instead analyzed whether any duties that *might* exist were subject to the discretionary function exception, stating:

"The only way that Defendant[s] could have protected Plaintiffs from Adam's violent behavior was to seek and obtain an order for involuntary care and treatment. Such an order was entered in May of 1999. The decision to allow this order to expire and the decision not to seek additional orders for involuntary care and treatment were discretionary functions. Because the Plaintiffs' claims are based upon Defendant[s'] performance or failure to perform discretionary functions, Plaintiffs' claims are barred by K.S.A. 75-6104(e)."

Katherine and Alexandra now appeal, and pursuant to K.S.A. 20-3018(c), this court transferred the appeal on its own motion.

The Plaintiffs disagree with the district court's finding that the Defendants' decision to allow the involuntary outpatient treatment order to expire, rather than recommend an extension, was protected under K.S.A. 2008 Supp. 75-6104(e), the discretionary function exception to the KTCA. The Plaintiffs argue the Defendants cannot claim governmental immunity because they violated clearly defined legal duties that they were required to follow.

While the Defendants ask this court to affirm the conclusion that the discretionary function exception applies, they suggest that we should address the preliminary analytical step of determining whether the Defendants owed a duty to the Plaintiffs. The Defendants argue the issue of duty is dispositive. In addition, the County cross-appeals on the limited issue of whether this court lacks jurisdiction over Alexandra's claims because her notice of appeal was not timely filed.

### Standard of Review

This court's standard of review on appeal from summary judgment is a familiar one:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case." *Miller v. Westport Ins. Corp.*, 288 Kan. 27, Syl. ¶ 1, 200 P.3d 419 (2009).

On appeal from summary judgment, an appellate court applies the same rules as the district court, and where the appellate court finds reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Miller*, 288 Kan. at 32. When material facts are uncontroverted, as they are in this case, an appellate court reviews summary judgment de novo. *Troutman v. Curtis*, 286 Kan. 452, Syl. ¶ 1, 185 P.3d 930 (2008); *Klein v. Oppenheimer & Co.*, 281 Kan. 330, Syl. ¶ 7, 130 P.3d 569 (2006).

## KTCA

The focus of the district court's decision was an exception to liability under the KTCA, K.S.A. 75-6101 *et seq*. This suit is subject to the KTCA because the Defendants are a governmental body and employees of that entity (or its agency). See K.S.A. 2008 Supp. 75-6102(b), (c) (defining "[g]overnmental entity" to mean the state or a municipality and including counties such as Sedgwick County in the definition of "municipality"); see also K.S.A. 2008 Supp. 75-6102(d) (defining "employee" as including "any person acting on ·behalf or in service of a governmental entity in any official capacity").

The KTCA provides:

"(a) Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances *where the governmental entity, if a private person, would be liable under the laws of this state*." (Emphasis added.) K.S.A. 2008 Supp. 75-6103(a).

Several exceptions modify this general rule, including the exception relied on by the district court—the discretionary function exception of K.S.A. 2008 Supp. 75-6104(e). In order to invoke one of these exceptions and " 'avoid liability, the governmental entity has the burden of proving that it falls within one of the enumerated exceptions found in K.S.A. 75-6104.' " *Lane v. Atchison Heritage Conf. Center, Inc.*, 283 Kan. 439, 444, 153 P.3d 541 (2007) (quoting *Jackson v. U.S.D. 259*, 268 Kan. 319, 322, 995 P.2d 844 [2000]).

Hence, the analytical matrix established by the legislature in enacting the KTCA dictates that a governmental entity can be found liable for the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment only if (1) a private person could be liable under the same circumstances and (2) no statutory exception to liability applies.

### Negligence

Regarding the first requirement, in order to establish liability for negligence against a defendant, including a governmental agency, the plaintiff must establish: (1) The defendant owed a duty to the plaintiff; (2) the duty was breached; (3) the breach was the proxi-

mate cause of the plaintiff's injury; and (4) the plaintiff sustained damages. *Hesler v. Osawatamie State Hospital,* 266 Kan. 616, 623, 971 P.2d 1169 (1999); *Burney v. Kansas Dept. of SRS,* 23 Kan. App. 2d 394, 397, 931 P.2d 26 (1997). Whether a duty exists is a question of law, and an appellate court's review is unlimited. See *Nero v. Kansas State University,* 253 Kan. 567, 571, 861 P.2d 768 (1993).

Although the Defendants' summary judgment motion touched on each of these elements, on appeal the Defendants focus on the element of whether they owed a duty to the Plaintiffs. In response, the Plaintiffs argue, as they alleged in their petitions, that the Defendants had a special relationship with Adam and with them. The language of the petitions parallels that found in the Restatement (Second) of Torts (1964) (Restatement), specifically Restatement § 315, which recognizes a duty in certain situations where a special relationship exists. The Plaintiffs also argue that the Defendants breached statutory duties.

### Care and Treatment Act

The Plaintiffs' arguments regarding a special relationship and a statutory duty are framed by the provisions of the Kansas Care and Treatment Act for Mentally Ill Persons, K.S.A. 59-2945 *et seq.* (the Act). Consequently, some discussion of the Act is necessary to our analysis of whether the Defendants owed a duty to the Plaintiffs.

In general, the Act includes provisions for (1) protecting the rights of individuals subject to the Act; (2) determining whether a person is a mentally ill person subject to involuntary commitment; (3) admitting and discharging voluntary patients from treatment facilities; (4) authorizing law enforcement officers to take a person suspected of being mentally ill into custody without a warrant; (5) administering medical treatment to individuals subject to the Act; (6) ordering outpatient treatment; (7) reviewing the status of individuals committed for treatment; and (8) disclosing a patient's medical records.

Under the provisions of this Act, on several occasions Adam was determined to be subject to involuntary commitment. This means that at the time of commitment Adam was a

"mentally ill person . . . who also lacks capacity to make an informed decision concerning treatment, is likely to cause harm to self or others, and whose diagnosis is not solely one of the following mental disorders: Alcohol or chemical substance abuse; antisocial personality disorder; mental retardation; organic personality syndrome; or an organic mental disorder." K.S.A. 59-2946(f)(1).

Each of the phrases "mentally ill person," "lacks capacity to make an informed decision concerning treatment," and "likely to cause harm to self or others" are defined in K.S.A. 59-2946(e) and (f). The first phrase—"mentally ill person"—is defined to mean:

"[A]ny person who is suffering from a mental disorder which is manifested by a clinically significant behavioral or psychological syndrome or pattern and associated with either a painful symptom or an impairment in one or more important areas of functioning, and involving substantial behavioral, psychological or biological dysfunction, to the extent that the person is in need of treatment." K.S.A. 59-2946(e).

The second phrase—"lacks capacity to make an informed decision concerning treatment"—is defined to mean that

"the person, by reason of the person's mental disorder, is unable, despite conscientious efforts at explanation, to understand basically the nature and effects of hospitalization or treatment or is unable to engage in a rational decision-making process regarding hospitalization or treatment, as evidenced by an inability to weigh the possible risks and benefits." K.S.A. 59-2946(f)(2).

The final phrase—"likely to cause harm to self or others"—is defined to mean, in relevant part, that "the person, by reason of the person's mental disorder: (a) Is likely, in the *reasonably foreseeable future*, to cause substantial physical injury or physical abuse to self or others or substantial damage to another's property, *as evidenced by behavior threatening, attempting or causing such injury, abuse or damage*." (Emphasis added.) K.S.A. 59-2946(f)(3).

Evidence establishing that a proposed patient's condition meets these definitions must be presented at a trial. If a district court determines the criteria are met, an order of involuntary commitment may be entered. The order may not commit the patient for more than 3 months from the date of the trial. K.S.A. 2008 Supp. 59-2966(a). At least 14 days before the end of the treatment period, the head of the treatment facility must file a report "summarizing the treatment provided and the findings and recommendations for

the treatment facility concerning the need for further treatment for the patient." If further treatment is recommended, the patient has a right to a hearing. K.S.A. 59-2969(a),(b). At that point:

"Upon completion of the hearing, if the court finds by clear and convincing evidence that the patient continues to be a mentally ill person subject to involuntary commitment for care and treatment under this act, the court shall order continued treatment for a specified period of time not to exceed three months for any initial order for continued treatment, nor more than six months in any subsequent order for continued treatment, at an inpatient treatment facility as provided for in K.S.A. 59-2966 and amendments thereto, *or at an outpatient treatment facility if the court determines that outpatient treatment is appropriate under K.S.A. 59-2967* and amendments thereto." (Emphasis added.) K.S.A. 59-2969(f).

As this provision indicates, there are criteria for determining if outpatient treatment, such as the order relating to Adam's treatment, is appropriate. K.S.A. 59-2967 provides:

"(a) An order for outpatient treatment may be entered by the court at any time in lieu of any type of order which would have required inpatient care and treatment if the court finds that the patient is likely to comply with an outpatient treatment order *and that the patient will not likely be a danger to the community or be likely to cause harm to self or others while subject to an outpatient treatment order.*" (Emphasis added.)

If these requirements are met, the court may order outpatient treatment and, in doing so, may state specific conditions for outpatient treatment. These conditions impose obligations on both the treatment facility and the patient. See K.S.A. 59-2967(c), (e). It is those obligations imposed on treatment facilities that are relied on by the Plaintiffs as a basis for the Defendants' duties.

The first statutory provision that Plaintiffs assert as a basis for a duty—K.S.A. 59-2967(e)—provides that "[t]he treatment facility shall immediately report to the court any material noncompliance by the patient with the outpatient treatment order." The district court found it uncontroverted that Adam was not compliant in taking at least some of his medications, "which is material noncompliance with the outpatient treatment order." Further, it is uncontroverted that the Defendants did not report this noncompliance to the court.

The Plaintiffs note that on receipt of a report of noncompliance, the court can modify the order and allow the patient to remain at liberty or "the court may enter an ex parte emergency custody order providing for the immediate detention of the patient." K.S.A. 59-2967(e). If the patient is taken into custody, a hearing must be conducted "not later than the close of business on the second day the court is open for business after the patient is taken into custody." K.S.A. 59-2967(f)(1). The statute further provides:

"The hearing held pursuant to subsection (f) shall be conducted in the same manner as hearings provided for in K.S.A. 59-2959 and amendments thereto. Upon the completion of the hearing, if the court finds by clear and convincing evidence that the patient violated any condition of the outpatient treatment order, the court may enter an order for inpatient treatment, except that the court shall not order treatment at a state psychiatric hospital unless a written statement from a qualified mental health professional authorizing such treatment at a state psychiatric hospital has been filed with the court, or may modify the order for outpatient treatment with different terms and conditions in accordance with this section." K.S.A. 59-2627(g).

If a report of noncompliance is not filed, there is still a reporting obligation. K.S.A. 59-2969(a) requires that the head of a treatment facility—at least 14 days prior to the end of each treatment period—must submit a report summarizing the treatment provided and the findings and recommendations of the treatment facility concerning the patient's need for further treatment. The Plaintiffs cite this provision as the second basis for arguing a statutory duty existed. Although the Plaintiffs recognize that the Defendants filed a report, they argued to the district court, as they do on appeal, that the Defendants breached a statutory duty to file an *accurate* progress report regarding Adam before his treatment ended. The Plaintiffs point to the Defendants' failure to report that Adam was noncompliant with his medications and was resistant to case management.

## Duty

Although the failure to report the noncompliance or to accurately report Adam's progress during treatment is undisputed, the Defendants insist that they did not breach a duty owed to the Plaintiffs. The parties cite several cases decided by this court and

federal courts that have considered whether Kansas statutes impose duties that are owed to individuals injured by psychiatric patients and whether a special relationship exists that gives rise to a duty under Restatement § 315. None of these cases deal with a patient who was subject to an outpatient treatment order, but each assists in our analysis. We will discuss those cases but also consider additional Kansas cases that discuss Restatement § 315 and associated sections, outpatient treatment cases from other jurisdictions that apply Restatement § 315, and additional Kansas cases discussing duties arising from reporting statutes. We will then apply those cases to the statutory and factual framework involved in this case.

### Durflinger

In the first of the Kansas cases, *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983), a psychiatric patient fatally shot his mother and brother 1 week after his discharge from an involuntary commitment. Heirs brought a diversity action against the hospital and several psychiatrists in federal court. Because the theory of recovery had not been considered in a Kansas case, the federal court certified a question to this court: Would Kansas recognize a valid cause of action for a claim which grew out of a negligent release of an involuntarily institutionalized patient who had violent propensities, as distinguished from negligent failure to warn persons who might be injured by the patient as result of the release? This court answered the question "yes."

In doing so, the court rejected the plaintiffs' argument that the duty arose from a special relationship between the plaintiffs and the defendants. Rather, this court held that "general rules of negligence and medical malpractice control and there is no reason to apply the concept of a special relationship and the resulting affirmative duty to take some special step to protect a third party or the public." *Durflinger*, 234 Kan. at 499.

### Boulanger

This holding was disapproved in part, however, in the next case to consider the relationship between a psychiatrist and those who

were injured by a psychiatric patient. In *Boulanger v. Pol*, 258 Kan. 289, 900 P.2d 823 (1995), a patient shot his uncle shortly after his release from an intermediate care facility where he had been a voluntary patient. Relying on *Durflinger*, the plaintiff argued a duty arose from the physician-patient relationship and no additional basis had to be established. The *Boulanger* court disagreed, recognizing that a physician-patient relationship creates a duty owed to the patient only, not to those outside that relationship. 258 Kan. at 297-98. In addition, the *Boulanger* court limited *Durflinger*'s discussion of duty to cases involving involuntary commitments, stating:

"We conclude that the duty recognized in *Durflinger* was based upon the statutory provisions applicable to the commitment and release of involuntary patients and is not applicable to voluntary patients. The cause of action for negligent release of an involuntary patient recognized in *Durflinger* does not apply to voluntary patients." *Boulanger*, 258 Kan. at 303.

In reaching this decision, the *Boulanger* court discussed two intervening federal decisions—*Hokansen v. United States*, 868 F.2d 372 (10th Cir. 1989), and *Mahomes-Vinson v. United States*, 751 F. Supp. 913 (D. Kan. 1990),—the latter of which is relied on by the Plaintiffs in this case.

In *Hokansen*, the plaintiffs, who were appealing a federal district court decision that *Durflinger* applied only to involuntarily committed patients, argued that *Durflinger* should apply to voluntary as well as involuntary patients. The Tenth Circuit Court of Appeals rejected the argument and, in affirming the federal district court, noted that a patient may only be involuntarily committed if found to be "mentally ill," which means the person must be a danger to self or others. Observing "[t]hat is the critical distinction," the Tenth Circuit concluded that the *Durflinger* court had found a duty to the public arising from the "determination that the hospital professionals are required to make under the involuntary commitment statutes" that the patient is no longer a danger to self or others. In contrast, "[n]o such determination was required under the Kansas statutes when the hospital released [the patient] from treatment as a voluntary inpatient." *Hokansen*, 868 F.2d at 376-77.

The Tenth Circuit in *Hokansen* also noted:

"A voluntary patient may request discharge, and a hospital is then required to release the patient within the next three days. . . . [K.S.A.] 59-2907 [repealed L. 1996, ch. 167, sec. 65; now K.S.A. 59-2951], however, does not impose any duty upon the hospital to seek commitment. It does not even suggest any criteria by which a hospital should decide whether or not to seek commitment. In any event, the statutory language at no point suggests any obligation by the hospital to third parties to exercise the power to seek commitment." *Hokansen,* 868 F.2d at 376-77 n.7.

After citing and quoting from the decision in *Hokansen,* the *Boulanger* court considered the federal district court decision that is relied on by Katherine and Alexandra, *Mahomes-Vinson,* 751 F. Supp. 913, in making their argument that a duty arose under Restatement § 315. The case does not support their statutory duty argument, however.

*Mahomes-Vinson* arose after a voluntary patient, who had a long history of sexual and physical violence, was discharged from a veterans' hospital and 8 days later raped, sodomized, and killed two young girls. The plaintiff in *Mahomes-Vinson* acknowledged the holding in *Hokansen* but argued an amendment to the statute allowed for a different result. The amendment, adopted in 1986, provided: "Nothing in this act shall prevent the head of a treatment facility or other person from filing an application for determination of mental illness with respect to a voluntary patient who is refusing reasonable treatment efforts and is likely to cause harm to self or others if discharged." K.S.A. 1986 Supp. 59-2907 (repealed L. 1996, ch. 167, sec. 65) (Currently, K.S.A. 59-2952 provides that the head of a treatment facility *"may* file a petition . . . seeking involuntary commitment of a voluntary patient who now lacks capacity to make an informed decision concerning treatment and who is refusing reasonable treatment efforts or has requested discharge from the treatment facility." [Emphasis added.]) The plaintiff argued the Kansas Legislature created a duty that did not exist in *Hokansen* by amending the statute in 1986 to indicate the head of the treatment facility could seek a commitment.

The federal district court disagreed, stating "the Kansas legislature in 1986 did not impose a duty on the defendant to apply for a determination of mental illness." *Mahomes-Vinson,* 751 F. Supp.

at 919. The court distinguished between having a mechanism available and having a duty that required use of the mechanism.

Quoting this discussion, the *Boulanger* court noted the 1986 amendment also applied in its case, and it also rejected the existence of a duty under the provision. 258 Kan. at 302-03. In *Boulanger*, the patient—like Adam—had been hospitalized on several occasions. At least one hospitalization arose after the patient assaulted his father and attempted to stab himself. Although the patient's last hospitalization was voluntary, the head of the hospital evaluated whether the discharge should occur and allowed the discharge because he did not believe the patient was dangerous to himself or others as long as he took his medication and was in a structured setting. The patient was transferred to an intermediate care facility where his daily medication was monitored and he was observed for evidence of continuing homicidal or suicidal ideation. After a period of time, he was discharged to his parent's care. Ten days later he shot his uncle.

Under those circumstances, the court agreed with the holding in *Mahomes-Vinson* that, even if the propensity for danger existed, the existence of a mechanism for seeking commitment did not create a duty to have the patient committed. Thus, the court concluded no statutory duty was owed to the uncle. *Boulanger*, 258 Kan. at 303.

The *Boulanger* court then focused on the uncle's argument that the defendants owed him a duty under the special relationship doctrine set forth in Restatement § 315, which provides:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Citing to *C.J.W. v. State*, 253 Kan. 1, 7-8, 853 P.2d 4 (1993), the *Boulanger* court recognized several ways for a special relationship to exist: A duty to control arises because of the relationship between a parent and child (Restatement § 316), master and servant (Restatement § 317), persons in charge of one with dangerous pro-

pensities (Restatement § 319), and persons with custody of another (Restatement § 320). *Boulanger*, 258 Kan. at 303; see Restatement § 315, Comment c (special relations between the actor and the third person "which require the actor to control the third person's conduct are stated in §§ 316-319"; those which arise because of a relationship between the actor and another that "require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320").

The plaintiff in *Boulanger*, like the plaintiffs in *Mahomes-Vinson* and in this case, relied on Restatement § 319. That section provides:

"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harms to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

The *Boulanger* court noted that the federal district court in *Mahomes-Vinson* and several courts in other jurisdictions had recognized a duty based on Restatement §§ 315 and 319 requiring a mental health care provider to take some affirmative action to protect a forseeable victim of the patient, such as notifying the potential victim, calling the police, or instituting commitment proceedings. The *Boulanger* court rejected that view under the facts of the case before it, however. The court noted the patient's uncle knew of the patient's dangerous propensities and that the patient considered the uncle to be the "devil incarnate." See 258 Kan. at 290-92, 307-08. Because of this knowledge, the court concluded there was no duty to warn. *Boulanger*, 258 Kan. at 307.

Additionally, the *Boulanger* court concluded the doctors did not have a duty to seek the involuntary commitment of the patient and concluded that "defendants did not have the requisite control of [the patient] which might conceivably create a duty under § 319." *Boulanger*, 258 Kan. at 308. Thus, the *Boulanger* court concluded there was no special relationship imposing a duty under the Restatement or under Kansas statutes. 258 Kan. at 308.

## Hesler

The next case to consider the question of whether a mental health care provider had a duty to control a patient with dangerous

propensities was *Hesler v. Osawatomie State Hospital*, 266 Kan. 616, 971 P.2d 1169 (1999). *Hesler* arose in a context where the mental health hospital had greater, but not complete, control of a patient who had been involuntarily committed.

In *Hesler*, an involuntarily committed patient was released from the hospital on a weekend pass. While riding in his mother's car, the patient grabbed the steering wheel and steered the car into the path of an oncoming car. The driver of the other car was killed, and the patient's mother was injured. The plaintiffs argued that *Durflinger* controlled, and the mental health care providers owed a duty to them based on the statutory standard that a patient could only be released if determined to no longer be a danger to himself or others. The district court characterized the plaintiffs' position by stating that because the patient "was in need of care and treatment, he was, by definition of law, dangerous to himself and others. Therefore, OSH had a duty to simply confine the [patient] until released by court order or until he was in no further need of treatment." *Hesler*, 266 Kan. at 628.

This court rejected the plaintiffs' contention that there was a duty to maintain complete control over the involuntarily committed patient. The court simply stated: "The statute does not support such a theory." *Hesler*, 266 Kan. at 628.

Having found no basis for a statutory duty, the *Hesler* court focused on whether there was a special duty under §§ 315 and 319 of the Restatement. Noting the mental health providers had no reason to perceive the patient was a threat to the plaintiffs when they approved the weekend pass, the court concluded there was not a special relationship giving rise to a duty. *Hesler*, 266 Kan. at 632.

In reaching this decision, the court cited several cases arising in contexts other than the treatment of mentally ill patients. These cases and some decided after the *Hesler* decision explain Kansas' approach to Restatement §§ 315 and 319.

*Nonmental Health Cases*

Several of these cases applying Restatement §§ 315 and 319 have emphasized the requirement that the defendant "must take

charge" and have the ability to "control" the wrongdoer. As stated, in *Calwell v. Hassan*, 260 Kan. 769, 780, 925 P.2d 422 (1996), Restatement § 315 liability is limited to situations "in which the party owing the duty did have the ability or right to control the third person causing the harm. [Citations omitted.]" 260 Kan. at 783. In fact, the *Calwell* court observed that this court has "imposed a § 315 duty only in situations involving a dangerous person in a custodial setting." 260 Kan. at 780; see, *e.g.*, *C.J.W.*, 253 Kan. 1 (under Restatement §§ 315 and 319 government owed special duty to 12-year-old boy confined in juvenile detention center when he was assaulted, raped, and sexually molested by another older youth; also basing result on Restatement § 320); *Cansler v. State*, 234 Kan. 554, 564, 675 P.2d 57 (1984) (under Restatement § 319 government had control of prison inmates and owed special duty to officer who was shot when seven inmates escaped); see also *Jackson v. City of Kansas City*, 263 Kan. 143, 156-60, 947 P.2d 31 (1997) (based on Restatement § 320, court found duty when officers arrested and handcuffed plaintiff at scene of domestic incident but failed to protect him from his girlfriend, who slit his throat as he sat on the curb while officers completed reports); *Thomas v. Board of Shawnee County Comm'rs*, 40 Kan. App. 2d 946, 951-56, 198 P.3d 182 (2008) (finding Restatement § 314A overlapped with Restatement §§ 319 and 320 and was more applicable when inmate committed suicide); *Washington v. State*, 17 Kan. App. 2d 518, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992) (Restatement §§ 315, 319, and 320; prison inmates fighting each other).

When a defendant does not have the ability to control the behavior that causes the harm, this court has not found the special relationship that must exist before a duty arises under §§ 315 and 319 of the Restatement. For example, this court focused on the fact that the defendants had neither legal nor physical custody of a child who was abused in a day care facility in concluding there was no special relationship between the child and governmental agencies that were allegedly negligent in granting a license to the facility and in failing to revoke the facility's license. *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 832-33, 877 P.2d 430 (1994). Similarly, we have concluded that a school does not control a student to the

extent of creating a special relationship. *E.g., Beshears v. U.S.D. No. 305*, 261 Kan. 555, 560-61, 566, 930 P.2d 1376 (1997) (defendant school district did not owe duty to minor plaintiff for injuries occurring off school premises and after school hours; district had neither ability nor right to control plaintiff or person causing harm); *Nero v. Kansas State University*, 253 Kan. 567, 581-82, 861 P.2d 768 (1993) (fact university had changed student's residence hall assignment after rape accusation did not mean the university was "in charge" or "took charge" of accused rapist within the meaning of Restatement §§ 315 and 319).

Similarly, other cases have emphasized that the relationship must allow one to control another's actions and the control must be of the nature to prevent the harm that caused a plaintiff's damages. See, *e.g., D.W. v. Bliss*, 279 Kan. 726, 734-37, 112 P.3d 232 (2005) (discussing cases and concluding no duty to control spouse; although finding duty as to possessor of land owed to licensees); *Thies v. Cooper*, 243 Kan. 149, 151, 753 P.2d 1280 (1988) (employer had no duty to control employee who, after consuming alcohol on employer's premises, left employer's premises and, while off duty, injured other persons).

The case most analogous to the facts in this case is *Schmidt v. HTG, Inc.*, 265 Kan. 372, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998), which was relied on heavily in *Hesler*. In that case, the plaintiffs alleged a parole officer, who was supervising a parolee, owed a special duty to the parolee's coworkers to advise them of the parolee's dangerous propensities. Hence, unlike this case, *Schmidt* was primarily a duty to warn case. Nevertheless, it is instructive because of its discussion of the type of control that is necessary to give rise to a duty under Restatement § 319. This discussion occurred in the context of the court's rejecting the out-of-state cases cited to support the plaintiffs' position that a duty existed. The court stated:

"The better-reasoned and more logical approach is that taken in *Fox v. Custis*, 236 Va. 69, 75, 372 S.E.2d 373 (1988), which held that state parole officers did not take charge or exercise control over a parolee within the meaning of § 319, giving rise to any 'special relationship.' The Virginia Supreme Court held:

" 'The relationship between the parolee and officer is usually continuing because parole normally is for an extended period of time. But to "supervise and assist" during this period does not mean to assert custody in the sense that the parolee is in the personal care and control of the officer. While the record does not show the terms and conditions of [the] parole, parolees ordinarily are essentially free to conduct their day-to-day affairs, adhering to specific rules and reporting certain activities to the parole officer as they occur or are planned. The applicable statute does not contemplate continuing hourly or daily dominance and dominion by a parole officer over the activities of a parolee.

" 'Therefore we hold that the defendants did not take charge of or exercise control over [the parolee] within the meaning of accepted rules of tort law articulated in Restatement §§ 315(a) and 319.' 236 Va. at 75." *Schmidt*, 265 Kan. at 386-87.

The *Schmidt* court applied this reasoning to determine that a parole officer did not have a special relationship with a person who worked with and was killed by a parolee. 265 Kan. at 387. The reasoning of the decision continues the line of Kansas cases requiring a significant control over the person with dangerous propensities, specifically the ability to exercise control in a manner that can prevent the injury.

*Out-of-State Cases*

As the *Schmidt* court recognized, its decision is contrary to cases from some other jurisdictions. The difference is not in the rule— *i.e.*, that there must be control of a nature that could prevent the harm—but in the determination of whether that type of control existed. After discussing the split of authority, this court adopted what some view as the narrower approach and determined that requisite control does not exist in a parole situation. See 265 Kan. at 385-87.

Similarly, there is a split of authority in the cases considering whether a Restatement § 319 duty exists between mental health care providers and mentally ill outpatients. Several courts have concluded an outpatient setting inherently lacks the level of control to give rise to a Restatement § 319 duty or that public policy militates against imposing a duty in that setting. See, *e.g.*, *Currie v. United States*, 836 F.2d 209, 213 (4th Cir. 1987); *Hasenei v. United States*, 541 F. Supp. 999, 1009 (D. Md. 1982); *King v. Smith*, 539 So. 2d 262, 264 (Ala. 1989); *Cooke v. Berlin*, 153 Ariz. 220, 224-25, 735

P.2d 830 (Ct. App. 1987); *Boynton v. Burglass*, 590 So. 2d 446, 448-49 (Fla. Dist. App. 1991); *Santa Cruz v. N.W. Dade Com. Health Ctr., Inc.*, 590 So. 2d 444, 445-46 (Fla. Dist. App. 1991); *Wagshall v. Wagshall*, 148 A.D.2d 445, 446-47, 538 N.Y.S.2d 597 (1989).

The Plaintiffs in this case cite and rely on a case taking the opposite view—*Morgan v. Fam. Counseling Ctr.*, 77 Ohio St. 3d 284, 673 N.E.2d 1311 (1997). In *Morgan,* the Ohio Supreme Court noted that Restatement § 320 imposes a duty on one who "takes the custody" of another to control the conduct of the other to prevent them from doing harm to others. As compared to this requirement of "custody," the Ohio court viewed the "takes charge" requirement of Restatement § 319 as covering "diverse levels of control which give rise to corresponding degrees of responsibility." *Morgan*, 77 Ohio St. 3d at 299.

In part, the Ohio Supreme Court based the mental health care provider's ability to control on the ability to commit the patient. *Morgan*, 77 Ohio St. 3d at 309. In addition, the Ohio Supreme Court aligned the mental health care provider's duties to the patient with the duties owed to third parties, stating: "Society's interest in being free from harm caused by mentally ill persons is, in the final analysis, dependent upon '[t]he patient's right to good medical care.' [Citation omitted]. Without good medical care, society would stand unprotected from mental patients with violent propensities." 77 Ohio St. 3d at 307.

As we consider this holding, we recognize the validity of the analytical distinction between Restatement §§ 319 and 320. Yet, Kansas precedent is contrary to the rationale of the *Morgan* decision. First, this court rejected a reliance on the duties arising from a psychiatrist-patient relationship as a basis for a duty with a person outside that relationship in *Boulanger*, 258 Kan. at 297-98, 303. Second, *Boulanger* held that the leverage of having a mechanism to involuntarily commit a patient did not give rise to a duty to commit, 258 Kan. at 303, and *Hesler*, indicates that even involuntarily committed patients are entitled to the least restrictive environment called for by the patient's current condition. 266 Kan. at 632.

In addition, the view adopted in *Schmidt* and other Kansas cases is more in line with the view taken by the Ohio Supreme Court dissenters in *Morgan*, who argued that Restatement § 319 requires evidence of an ability to control in a manner that would be meaningful in the prevention of the harm that actually occurred. *Morgan*, 77 Ohio St. 3d at 317-19 (Cook, J., dissenting; Moyer, C.J., and Stratton, J., concurring in dissent); see *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 853 (Ky. 2005) (considering whether special relationship exists in employment situation; recognizing cases generally require " 'control' . . . 'in a very real sense' " and that the control "must be related in some manner to the harm caused by the person under control, such that its exercise would restrict the person's ability to cause harm"). Hence, *Morgan* does not persuade us that a duty arises under Restatement § 319.

*Statutory Reporting Obligations*

Nevertheless, as we previously noted, all of these cases, while helpful in distilling Kansas' view, are distinguishable from this case because of the statutes and court order dealing with outpatient treatment, which imposed reporting obligations under K.S.A. 59-2967(e) and K.S.A. 59-2969(a) that were violated by the Defendants. Consequently, we must consider an additional line of cases that deal with statutory reporting obligations. Of these cases, the one that is the most analogous is *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 352, 819 P.2d 587 (1991), which involved the sexual molestation of a student by an employee retained by a school district to transport students in a special education program who had been reported to call the children names and act in a manner described as "out of control."

In *Kansas State Bank & Tr. Co.*, it was argued that the statutory obligation to report child abuse created a duty to a child who was subsequently abused. This court noted that the reporting obligations were intended, at least in part, to protect the general public. Nevertheless, generally "[s]tatutes enacted to protect the public . . . do not create a duty to individuals injured as a result of a statutory violation." 249 Kan. at 371; but see *Schlobohm v. United*

*Parcel Service, Inc.*, 248 Kan. 122, 125, 804 P.2d 978 (1991) (citing rule but finding legislative intent to create duty in adopting building regulations that was owed to special class of individuals which included plaintiff who was injured in fall on noncompliant premises; Restatement §§ 288 Comments a and d, 288B Comments a and d). Applying this general rule, this court rejected the argument that the child abuse reporting statute created a duty owed to a subsequently abused child. In doing so, the court adopted the reasoning of an Indiana court that concluded:

" 'When the provisions of the act are considered as a whole, there is no apparent intent to authorize a civil action for failure of an individual to make the oral report that may be the means of initiating the central procedures contemplated by the act. Furthermore, such an action is not authorized at common law . . . . It would, we believe, misdirect judicial time and attention from the very real problems of children in need of services in favor of pursuing collateral individuals, who are presumably capable of responding in money damages, on the ground that they knowingly failed to make an oral report. We concluded that was not within the legislative purpose of the act.' " *Kansas State Bank & Tr. Co.*, 249 Kan. at 372-73 (quoting *Borne v. N.W. Allen County School Corp.*, 532 N.E.2d 1196, 1203 [Ind. App.1989]).

## Duties in this Case

The same rationale applies in this case and is generally supported by the cases we have discussed applying the Act. The reporting requirement of K.S.A. 59-2967(e) relating to noncompliance with the outpatient treatment order, which was also included in the court order, provides a means to initiate the procedures in the Act in the same way as the child abuse reporting requirements are a means to initiate procedures under the child in need of care provisions. And, the child abuse reporting requirements, like those in the reporting requirements relating to outpatient therapy, were intended to protect the general public from those with dangerous propensities but were not intended to create a duty to particular individuals who are injured by the one with dangerous propensities. Thus, applying the reasoning of *Kansas State Bank & Tr. Co.* to this case, we conclude the reporting obligation imposed by K.S.A. 59-2967(e), while creating a duty owed to the public, did not create a statutory duty that was owed to the Plaintiffs.

In other respects, particularly with regard to the obligation imposed by K.S.A. 59-2969(e) to report to the court regarding Adam's treatment and to recommend whether treatment should be continued, *Durflinger, Boulanger, Hokansen, Mahomes-Vinson*, and *Hesler* are instructive. These cases create a continuum of sorts, with *Durflinger*—dealing with a patient involuntarily committed to inpatient treatment—at one end; *Boulanger, Hokansen*, and *Mahomes-Vinson*—dealing with voluntary patients—at the other; and *Hesler*—dealing with an involuntarily committed patient not under the constant control of the defendants—in between. This case, like *Hesler*, fits somewhere in between the two end points of this continuum, where a court has ordered treatment but around the clock hospitalization is not required.

In *Hesler*, 266 Kan. 616, a pass from the hospital was allowed when treatment personnel determined it was appropriate. Here, Adam was in outpatient treatment and treatment personnel recommended that treatment be terminated. Had, however, Adam's noncompliance led to a recommendation of continuing treatment, Adam could have either been committed to a state hospital again or the outpatient treatment order could have been continued. In considering these potential outcomes, the circumstances existing when the Defendants recommended that the outpatient order expire must be considered. At that time, Adam—like the patient in *Hesler*—was not deemed to be dangerous. Adam had been released from inpatient care, which means that it had been determined by someone other than the Defendants that Adam was "not likely [to] be a danger to the community or [to] be likely to cause harm to self or others." K.S.A. 59-2967(a); see K.S.A. 59-2946(f)(3) (defining "likely to cause harm to self or others" to mean patient "in the reasonably foreseeable future" is likely to cause substantial physical injury or physical abuse, "as evidenced by behavior threatening, attempting or causing such injury, abuse or damage"). Further, as of September 10, 1999 (which was several weeks after the outpatient order had expired), Dr. Porter noted that Adam stated he "feels much better" and "denies any aggressivity." Dr. Porter's diagnosis stated that Adam was "in partial remission," and Dr. Por-

ter even noted that there had been no contact from the family suggesting concerns.

When Adam was not a danger to others, he was entitled to the least restrictive environment possible, an environment in which the Defendants lacked the ability to exercise the type of dominion that would have prevented the harm to the Plaintiffs. See *Hesler*, 266 Kan. at 632. Consequently, to impose a duty to seek commitment at that point in time would be contrary to the policy of the Act for, as one court observed, "lack of control by the therapist and maximum freedom for the patient is oft times the end sought by both the psychiatric profession and the law." *Hasenei*, 541 F. Supp. at 1009-10. Thus, as this court determined in *Hesler*, although Adam had been involuntarily committed and ordered to participate in outpatient therapy, there was no statutory duty to refuse Adam an environment less restrictive than hospitalization. And, under the *Boulanger/Hokansen* rationale, the Act, even though it provides a mechanism to hospitalize a patient, does not impose a duty to commit individuals to inpatient treatment.

Alternatively, if the report would have recommended continuation of the outpatient order and the order had not expired, there is no provision in Kansas law that would have given the Defendants the level of control over Adam's actions that would have prevented Adam's attack on his mother. Ultimately, the only way to gain the control was through commitment, and no provision of the Act imposes a duty to take that action. In addition, the reasoning of *Hesler* is once again applicable and suggests that, even if a patient is under court-ordered treatment, no duty arises to maintain control of the patient if the patient is not deemed at that point in time to be dangerous. Hence, we conclude K.S.A. 59-2969(a) does not impose a duty owed to individuals who are injured by the outpatient to recommend continued outpatient treatment when a mental health patient is not a danger to the community when the report is made.

Finally, we must apply these cases to determine whether there was a duty owed under Restatement §§ 315 and 319. The Kansas cases applying these sections require real control that would allow the prevention of the harm that gives rise to the lawsuit. In a manner comparable to the relationship between a parole officer and

the parolee discussed in *Schmidt*, 265 Kan. at 386-87, neither the actual level of supervision inherent in the outpatient therapy relationship nor the leverage of reporting noncompliance gave the Defendants this type of control over Adam or his actions. In other words, an outpatient mental health treatment facility does not take charge of a patient subject to an order for outpatient therapy in a manner that gives rise to a duty to control the patient's conduct or to give rise to a special relationship with others who come in contact with the patient.

*Conclusion*

Hence, we conclude there was no duty under Restatement §§ 315 and 319—the only Restatement sections raised by the Plaintiffs—and no statutory duty owed by Defendants to the Plaintiffs. Because we conclude that there was no duty, we need not address the question of whether the discretionary function exception applies. See *Hesler*, 266 Kan. at 632-33 ("Having decided that defendants owed no duty to plaintiffs, we need not base our decision on whether the Kansas Tort Claims Act [KTCA] provides defendants immunity from plaintiffs' claims under the KTCA"); *Kansas State Bank & Tr. Co.*, 249 Kan. at 368. Nor do we need to address the other reasoning of the district court or the County's cross-appeal. See *In re Marriage of Bradley*, 282 Kan. 1, 8, 137 P.3d 1030 (2006) (appellate court may affirm if district court reaches the right result; the reason given by district court for its ruling is immaterial if the result is correct).

Affirmed.

MCFARLAND, C.J., not participating.

DANIEL L. LOVE, District Judge, assigned.